## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAULIK SANGHAVI and MICHELLE ROBALINO-SANGHAVI,<br><br>Plaintiffs,<br><br>vs.<br><br>NAVIENT CORPORATION, NAVIENT SOLUTIONS, INC. f/k/a SALLIE MAE, INC. and SLM CORPORATION,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiffs, husband and wife, Maulik Sanghavi ("Plaintiff Sanghavi") and Michelle Robalino-Sanghavi, ("Plaintiff Robalino-Sanghavi") (collectively, "Plaintiffs") bring this action against Defendants Navient Corporation, Navient Solutions, Inc., ("Navient") formerly known as Sallie Mae, Inc. and SLM Corporation (collectively, "Defendants") and allege as follows:

## <u>INTRODUCTION</u>

1.      This is an action for fraud, violation of the New Jersey Consumer Fraud Act, breach of contract, and breach of the implied covenant of good faith and fair dealing against Defendants arising out of Defendants' flagrant fraud in servicing the student loan debt of Plaintiffs.

2.      Defendants service a significant portion of the student loan debt held in the United States – over $300 billion.  Plaintiffs, like many others, have diligently made their monthly loan payments and have tried to get out of debt sooner by making deliberate extra payments to principal.  Defendants, however, have developed a repayment system intended, by design, to maximize a borrower's indebtedness through a scheme to inflate interest and thwart

1

early repayment of principal in order to increase their own interest income – the bulk of their revenue stream.  To ensure student loan borrowers stay in debt as long as possible, Defendants routinely engage in unfair, deceptive, and illegal practices by implementing a scheme designed to misallocate extra student loan payments towards interest – a method which is most beneficial to themselves and most detrimental to the borrower.

3.      The structured repayment of debt is not a guessing game.  Monthly payments are formulaic and predictable – using factors including the initial amount of the loan, interest accrual, and repayment of principal and interest over time.  Yet, Defendants' repayment system model is a complicated array of fluid monthly billing amounts, hidden repayment terms, vague billing statements, labyrinth-like websites with inaccurate information, and calculated, non-responsive and misleading answers to questions about loans that Plaintiffs and student loan borrowers must wade through in order to repay their debt – leaving Defendants swimming in billions of profits and leaving student loan borrowers drowning in debt.

4.      Popular financial products go through predictable lifecycles: from a novel concept for an innovative new product, to pilot markets and then widespread use by consumers, to being exploited by unscrupulous industry insiders, to widespread consumer injury, and finally, to correction through market forces and/or government intervention and enforcement.  In the mortgage industry, new, creative ways to lower down payments to help increase home affordability, ultimately led to no-document and sub-prime mortgages.  In the credit card industry, easier approvals designed to increase credit card availability, ultimately led to exorbitant interest rates and dragnet clauses.  And now, the student loan, which was once a stepping stone for many – a reasonable loan with reasonable, clear terms for someone to be able to go college – has become a vehicle for unscrupulous insiders to abuse borrowers and make

billions on the back end.  Unlike sub-prime mortgages and high interest rate credit cards, which have experienced significant market adjustment and government intervention, the student loan industry is at an apex and in dire need of correction.

5.      Defendants employ a loan repayment system where student loans accrue interest based on the amount of principal of the outstanding loan.

6.      As a result, as a borrower makes extra payments to reduce the principal of the outstanding student loan, there should be less outstanding principal that accrues interest.  When these extra payments are applied correctly, the principal amount shrinks faster, which means the borrower will pay less in interest and spend less time in debt.  This cuts both ways, however, because the less interest a borrower pays, the less time a borrower spends in debt, which all amounts to less revenue for loan servicers like Defendants.

7.      Defendants have worked tirelessly to ensure the latter does not happen.

8.      Plaintiffs have dutifully played by Defendants' rules and exhausted all possible avenues of recourse with them – including Defendants' internal escalation process through its Office of the Customer Advocate – only to be stymied by Defendants at each turn.

9.      Defendants have shirked their regulatory obligations with impunity, and have caused significant harm, and continue to cause significant harm, to Plaintiffs.

10.      Some of Defendants' wrongful acts include, but are not limited to, the employment of a deliberately confusing and misleading payment application system, grossly misleading monthly statements, application of student loan payments in direct contravention to Plaintiffs' instructions, charging of phantom fees, obstructing the release of cosigners, incorrectly capitalizing interest, charging excess interest, manipulating past transaction history,

applying payments in contravention of its promissory notes, and failing to take any action to correct all of the above even when acknowledged by Defendants.

11.     Defendants' past and ongoing acts are deliberate and unconscionable.

12.     Plaintiffs have been damaged as a direct result of Defendants' willful and intentionally deceptive conduct.

### PARTIES

13.     Upon information and belief, Navient Corporation is a publicly-traded Delaware corporation, trading on the NASDAQ stock exchange under ticker symbol "NAVI."  Navient Corporation's principal place of business is at 123 Justison Street, Suite 300, Wilmington, Delaware 19801.

14.     Upon information and belief, originally, and at most of the times mentioned herein, a company that was known as "SLM Corporation" owned Sallie Mae, Inc., the student loan servicer from which some of Plaintiffs' loans originated.  Currently, another entity known as "SLM Corporation" exists, but was created through a system of corporate mergers, acquisitions, and name changes.

15.     Upon information and belief, Sallie Mae, Inc. was a subsidiary of SLM Corporation.  Sallie Mae, Inc. is now known as Navient Solutions, Inc.

16.     Upon information and belief, Navient Solutions, Inc., formerly known as Sallie Mae, Inc., is a wholly-owned subsidiary of Navient Corporation and engages in the servicing of both federal and private student loans.

17.     Upon information and belief, Navient Corporation became the successor to Sallie Mae, Inc. after a corporate reorganization in 2014.  Sallie Mae was granted a servicing contract with the U.S. Department of Education in 2009, which remains in effect today, subject to later

4

modifications.  All documents related to that original servicing contract were executed in the name of Sallie Mae or, subsequently, Navient.

18.     Upon information and belief, Navient Corporation assumed certain liabilities related to the servicing and collection activities of Sallie Mae and their subsidiaries.  Those liabilities include the servicing and collection of the private and federal loans described herein.

19.     A principal-agent relationship exists between Navient Corporation, and Navient Solutions, Inc., f/k/a Sallie Mae, Inc. and SLM Corporation.  Navient Corporation is the principal of all other related entities.

20.     Navient Corporation is liable for the wrongful acts of its subsidiary-agents.

21.     Alternatively or additionally, the acts of Defendants were conducted in concert pursuant to an express or implied agreement amongst themselves to act in this collective manner. All Defendants are therefore jointly and severally liable for the acts complained of herein.

22.     Plaintiff Sanghavi is an individual who resides in, and is a citizen of, the State of New Jersey.

23.     Plaintiff Robalino-Sanghavi is an individual who resides in, and is a citizen of, the State of New Jersey.

## JURISDICTION AND VENUE

24.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over Defendants because they regularly transact business in the State of New Jersey and have entered into contracts substantially connected with New Jersey.

5

26.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because Defendants are subject to personal jurisdiction in the District of New Jersey and because a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

## FACTUAL ALLEGATIONS

27.     Defendants are student loan servicers.

28.     Student loan servicers deal with a variety of issues affecting student loan borrowers that include the issuance of the loans, payment collections, providing repayment options to borrowers and, they can also function as a collection agency when students and cosigners default on their loans.

29.     Private student lending and servicing markets are highly concentrated.

30.     Navient is the largest student loan servicer in the United States.

31.     Navient services the loans of more than 12 million borrowers and more than $300 billion in federal and private student loans.

32.     Student loan servicers, like Defendants, are usually for-profit, publicly-traded companies, or subsidiaries of them.

33.     In their 2016 Form 10-K Annual Reports to the Securities and Exchange Commission, Navient and SLM Corporation reported net interest income from its educational loan portfolio of $1,705,000,000 and $891,000,000, respectively.

34.     To generate this massive amount of interest income, Defendants employ business policies and practices designed to maximize profits at the ongoing expense of student borrowers who took out student loans to cover the ever-increasing costs of higher education and achieve a better life.

I.     **Defendants are Financially Motivated to Maintain High Principal Balances For as Long as Possible to Boost Interest Income**

35.     Defendants have a strong financial interest in preventing student loan borrowers from paying additional principal more quickly than scheduled – enormous profits.

36.     Indeed, in their 2016 Form 10-K Annual Reports to the Securities and Exchange Commission, Navient and SLM Corporation reported that "[n]et interest income will be the primary source of cash flow generated by our portfolios of FFELP [Federal Family Education Loan Program] Loans and Private Education Loans."

37.     Defendants have rapidly grown their profits by thwarting student loan borrowers from paying off their loans early and thereby inflating income from interest.

38.     As described in detail below, Defendants, through their financial instruments, websites and online payment system, customer service representatives, and automated phone system, have constructed a system to intentionally misallocate student loan payments and obscure this misallocation to the benefit of Defendants and to the detriment of the student loan borrower.  And, therefore, have engaged and continue to engage in unfair and deceptive acts and practices.

II.     **Extra Payments Toward Principal Have a Significant Impact on the Duration and Total Cost of a Loan**

39.     A student loan, like most loans, is made up of payments of principal and interest amortized (spread out) over time.

40.     The principal of a loan is the amount initially borrowed from the lender.

41.     The interest on a loan is the amount of debt that accumulates based on: the outstanding principal, a fixed or variable interest rate, and time.

42.     Interest on student loans typically accrues daily.

43.     The student loans that Defendants service accrue interest according to its "Simple Daily Interest Calculation."  Navient's website offers the following formula:

> The amount of interest that accrues on your loan is determined by a simple daily interest calculation:
>
> Your current principal balance
> × The number of days since your last payment
> × Interest rate factor = interest rate ÷ 365.25 (number of days in a year)
> = Your daily interest rate.

44.     Alternatively, Navient's customer service representatives have explained the interest calculation this way:

> Daily interest accrual on your private student loans is calculated using the following formula: (Unpaid Principal x Interest Rate) divided by Number of Days in the Year = Approximate Daily Interest Approximate Daily Interest x Number of Days in Your Billing Period = Approximate Interest Due

45.     Under either calculation, the greater the current principal balance, the more interest that accrues per day.  Conversely, the lesser the current principal balance, the less interest that accrues per day.

46.     Therefore, two student loans with the same total balance and interest rate may nonetheless accrue different amounts of interest if one loan has a higher principal balance.

47.     For example, say a borrower has a current student loan with a balance due of $10,000, where $9,500 is owed as principal and $500 has accrued as interest.  And, the borrower's minimum monthly payment is $500 where $200 goes towards principal and $300 goes toward interest.  If she only made her minimum monthly payment, her total remaining balance would be $9,800 (rather than $9,500 since only $200 went toward lowering the principal with the remainder toward interest), and the interest would accrue on the $9,800 balance.  If,

8

however, she paid an extra $100 toward principal (so a total of $600/mo.), her total remaining balance would be $9,700 and the interest would accrue on that lesser amount going forward.

48.     If Defendants, however, misallocate the $100 extra loan payment to future payments, interest or other loans, instead of toward principal only as instructed, the student loan borrower, who should only accrue interest on $9,700 would still actually pay interest on the higher principal amount of $9,800.

49.     As a result, over the life of the loan, the student loan borrower, who tried to pay off her loans early, would instead be deprived of any benefit from the extra payment, and would pay significantly more in interest because Defendants refused to apply the extra payment to principal only.

50.     Over time, the correct allocation of extra payments toward principal can greatly reduce the overall cost of borrowing for students and significantly decrease the amount of time in debt.  Alternatively, when allocated the way Defendants service their loans, the extra payments to principal are either not applied at all or dramatically lowered, and increases the interest payments to Defendants and lengthens the overall time of indebtedness for the borrower.

51.     Plaintiff Robalino-Sanghavi is a practicing physician and has four medical school student loans with Defendants totaling approximately $470,000 according to Navient's records: (i) loan ending in 1-10 DL ("Loan 1-10 DL"), (ii) loan ending in 1-11 DL ("Loan 1-11 DL"), (iii) loan ending in 1312 ("Loan 1312" or "Signature Student Loan"), and (iv) loan ending in 9668 ("Loan 9668" or "Tuition Answer").

52.     Plaintiff Sanghavi is a practicing attorney and has two loans with Defendants totaling approximately $135,000 according to Navient's records:  (i) loan ending in 7483 ("Loan 7483") is a Private Consolidation Loan taken out in 2008 for loans associated with Seton Hall

University School of Law, and (ii) loan ending in 5114 ("Loan 5114" or "Smart Option") is a Navient product called the Smart Option Loan taken out in 2011 for a master of science degree from Columbia University.

53.     Plaintiffs have made numerous extra payments intended to pay down their principal balance over the years, however, Defendants have misused these extra payments and applied them toward excess interest and phantom fees, rather than to reduce Plaintiffs' outstanding principal balances.

## III.     Defendants Deliberately Misapply Capitalized Interest, Extra Interest, and Fees

54.     Student loans are typically in deferment status while a student is enrolled in school.  Navient's website defines deferment as "a period where you postpone making payments on your loan."

55.     Under certain types of loans in the deferment period, interest on the principal balance continues to accrue and is added to the principal at periodic intervals as Capitalized Interest.

56.     Once repayment on a loan begins, interest is no longer capitalized in the same manner as during deferment, and instead, begins to accrue and is applied daily.

57.     Defendants, however, incorrectly and randomly capitalized interest on loans while those loans were in repayment – rather than in deferment – and have repeatedly failed to correct or reverse the charges and reduce the principal – without explanation or justification, despite repeated requests from Plaintiffs.

58.    As set forth above, Plaintiff Robalino-Sanghavi has four medical school student loans with Defendants totaling approximately $470,000 according to Navient's records. Defendants have misallocated interest on her loans on numerous occasions.

59.    For example, on July 11, 2008, Plaintiff Robalino-Sanghavi took out a medical school student loan product by Navient called the Signature Student Loan (Loan 1312) for $12,171 at a variable interest rate currently at 7.00%.  The transaction history from Navient's website on July 11, 2008 shows the very first entry, normally categorized as a "Disbursement," incorrectly categorized as a "Repayment Fee" of $12,171 and adds $2,732.26 of capitalized interest as a separate entry on the same day.  Therefore, on the first day of this medical school loan, Plaintiff Robalino-Sanghavi's $12,171 loan ballooned to $14,903.26 and continued to capitalize interest on that inflated amount until she entered repayment after medical residency, by which time the balance on this particular loan had ballooned to almost $19,858.

60.    On several occasions over the phone and through Navient's online portal, Plaintiff Robalino-Sanghavi requested clarification or an explanation for the same-day capitalization of interest and categorization as "Repayment Fee."

61.    Navient's responses were either non-responsive or misleading.

62.    For example, on more than one phone call, Navient's representative could not explain the odd entries, and would insist Plaintiff Robalino-Sanghavi "refer to her promissory note" – Defendants' representatives claimed they did not have access to the promissory note and could not help with that review.  Notably, a promissory note would not and does not contain specific transaction histories.

63.   On May 24, 2017, exasperated by hours-long, fruitless conversations with Defendants' representatives, Plaintiff Robalino-Sanghavi wrote to Navient through its online portal.

> **Plaintiff Robalino-Sanghavi**:   The original balance of the Signature Student loan was $12,171 in 2006. The current balance 11 years later, as of May 2017 is $12,432, notwithstanding timely payments to principal and interest. Please provide a written statement explaining how the starting balance on the Signature Student loan of $12,171 ballooned to above $19,000 despite payments to principal.

> **Navient**: Thank you for your inquiry and for your business with Navient. Interest begins to accrue on all student loans from the date they are first disbursed until the date they are paid in full. The customer is responsible for paying the accrued interest on private student loans. Any unpaid accrued interest will capitalize (be added to the principal balance) at the end of a separation period and deferment and forbearance period. Please refer to your monthly statement for the amount of interest accruing each month. To view your account history for a specific loan, which includes the declining balance, select "By Loan" from the display filter. This will add a new filter box allowing you to select which loan you would like to view.
> You can also see your most recently scheduled and processed payments on your Account Summary.
> Not only does your Account History show when interest capitalized, or was added to your principal balance, but also how payments have been applied to principal, interest, and late fees, if applicable.

64.   As in this example, Navient systematically provided perfunctory responses in an effort to deceive and to discourage Plaintiff Robalino-Sanghavi from pursuing answers to her legitimate questions.  Navient's response does not answer how over $2,700 of interest could have possibly accrued on the <u>same day</u> the loan was taken out.

65.   Plaintiff Robalino-Sanghavi continued to seek answers from Navient.  The clearest, yet still unhelpful exchange with Navient on this topic was as follows:

> **Plaintiff Robalino-Sanghavi**: Could you please explain why the initial balance on the 1312 Signature Student loan on 7/11/2008 is categorized as a repayment fee of $12,171 and then also on 7/11/2008 Capitalized Interest of $2,732.26 is applied to the balance. Please also explain why the

capitalized interest was applied every six months until around 2012 when it switched to annually. Lastly, please explain why the capitalized interest appears in both principal and interest columns on the account history.

**Navient**: Thank you for contacting us with your inquiry. Your Loan -1312 was disbursed in the amount of **$12,171.00**. It is **most likely** reading as a "repayment fee" on your online account due to the translation of our transaction codes to labels. Please rest assured that you were not assessed a repayment fee of $12,171.00. The capitalization of $2,732.26 **is due to your repayment beginning.**

The interest will capitalize on your Signature Student Loan based off of the following information:
At the beginning of Repayment
Every 6 months during periods In-School Deferment and at the end of each period
At the end of Forbearance
Every 12 months during periods of Internship/Residency Deferment and at the end of each period
The capitalized interest appears in both columns because it is being removed from the interest column and added to the principal balance column.

66.     Navient's answer was again non-responsive, or at best, misleading.

67.     The Signature Student Loan was not in repayment.  Like many student loans, loans remain in a period of deferment while the student is in school, or in Plaintiff's case, medical school residency. The loan was not in repayment the day it was issued.  Plaintiff Robalino-Sanghavi entered repayment in 2013, not the same day as the loan was disbursed – which still does not answer why the loan was charged any interest the same day it was taken out. The interest charged to Loan 1312 was $2,732.26 on a loan of $12,171 – this represents a 22.45% interest capitalization as a separate transaction on the same day the loan was disbursed.

68.     Incidentally, Navient's Loan Detail section of its website incorrectly states the Repayment Start Date as June 11, 2008 (rather than Navient's transaction history section showing July 11, 2008, which is still incorrect).

13

69.     Navient's explanation that the disbursement miscategorization as a repayment fee was "most likely" due to the "translation of our transaction codes to labels" simply fails to address or correct the issue.

70.     As set forth above, Plaintiff Sanghavi has two loans with Defendants totaling approximately $135,000 according to Navient's records: Loan 7483, which is associated with Seton Hall University School of Law, and Loan 5114, which is associated with Columbia University.

71.     Both loans, however, are categorized by Navient as taken out for attendance at Columbia University.

72.     Despite repeated attempts to correct this miscategorization over the phone and through Navient's online portal, Navient has refused to acknowledge the miscategorization nor correct the issue.

73.     Notably, on or around August 29, 2017, Navient finally attempted to correct this error, but failed once more by categorizing both loans as "Consolidated."  Loan 5114 is not a consolidated loan.  But this is just the tip of the iceberg.

74.     Plaintiff Sanghavi has, and continues to have, identical experiences with Defendants on the issue of incorrectly applied capitalized interest.

75.     For instance, Plaintiff Sanghavi attended Columbia University from May 2011 through May 2012 for a master of science degree – classes were year-round beginning in May 2011 and Plaintiff Sanghavi received his degree in May 2012.  While enrolled, Plaintiff Sanghavi continued to make full payments on Loan 7483 (the loan from law school) through Navient's automatic debit system for the minimum payment of principal and interest each month.  Navient automatically debited a majority, but not all, of the payments that year.  Inexplicably, Navient

14

did not debit a payment in July 2011, November 2011, March 2012, and April 2012.  The month immediately preceding and immediately following each of the non-debit months, however, Navient <u>automatically</u> debited the full payment.  Moreover, in the months not debited, Navient <u>capitalized the interest</u>: August 13, 2011 $265.27, December 24, 2011: $327.40, and May 13, 2012: $429.10.  Each instance of capitalized interest was improperly added to the principal balance.

76.     Despite repeated conversations with Navient representatives on the phone and through Navient's online portal, Defendants have failed to offer any meaningful explanation for this error nor correct the interest entries and reduce the principal accordingly.

77.     Navient also incorrectly capitalized interest on Loan 5114.

78.     Plaintiff Sanghavi's Smart Option Loan 5114 entered full repayment in December 2012.  Under the Smart Option loan program, students have the option to "pay interest every month you're in school and in grace."

79.     While attending graduate school, Plaintiff Sanghavi made full monthly interest payments on Loan 5114.  In December 2012, the loan went into forbearance, according to Navient's records, where Navient charges a $50.00 fee and then postpones monthly payments for three months, but continues to accrue interest on the outstanding principal.  The interest-only monthly payments on Loan 5114 during school and in grace fluctuated between a low of $62.29 to a high of $207.75 – the average monthly interest payment was approximately $166.20.  When Loan 5114 was in full repayment, the monthly minimum payment (which would include principal) would be around $630.00 with, on average $430.00 to principal, $180.00 to interest.  This $180.00 to interest is important, because while in forbearance, Plaintiff Sanghavi continued to make payments of $301.00 a month to Loan 5114 – which should have completely covered

any interest accrual.  Yet, on March 11, 2013, Navient inexplicably capitalized interest.  Below

are payments made by Plaintiff Sanghavi and Navient's erratic application of those payments:

- From April 6 through December 6, 2012: Loan 5114 – Total $197.86, (with  $197.86 to interest), the principal balance remained unchanged
- December 26, 2012: Loan 5114 – Total $50 (payment of fee for forbearance)
- December 26, 2012: Loan 5114 – Total $301.00 (with $107.46 to principal, $193.54 to interest)
- December 27, 2012: Loan 5114 – Total $50 (Adjustment)
- January 11, 2013: Loan 5114 – Total $0.13 (Adjustment)
- January 31, 2013: Loan 5114 – Total $301 (with $4.75 to principal, $246.25 to interest, $50 to fees)
- February 3, 2013: Loan 5114 – Total $301 (with $279.56 to principal, $21.44 to interest)
- March 5, 2013: Loan 5114 – Total $301 (with $87.16 to principal, $213.44 to interest)
- March 11, 2013: Loan 5114 – Total $49.85 Capitalized Interest
- April 2, 2013: Loan 5114 – Total $301 (with $151.38 to principal, $149.62 to interest)
- April 6, 2013: Loan 5114 – Total $643.13 (Regular Payment with $614.68 to principal, $28.45 to interest)
- May 6, 2013: Loan 5114 – Total $643.13 (Regular Payment with $444.61 to principal, $196.49 to interest)
- October 31, 2013: Loan 5114 – Total $50 (Adjustment to principal).

80.    The above is just one example showing Defendants' haphazard applications of

payments that should otherwise be formulaic and relatively consistent.

81.    Defendants' erratic misallocation of interest is not limited to servicing of

Plaintiffs' current loans.  Plaintiff Sanghavi's Loan 7483 and Plaintiff Robalino-Sanghavi's Loan

1-10 DL and Loan 1-11 DL are the result of consolidation loans handled by Defendants.  The

transaction histories on those consolidated loans also show irregularities and misallocated

interest which inflated the principal balance and carried over into Plaintiffs' current loans with

Defendants.

82.    Plaintiffs have repeatedly requested information from Defendants to help reconcile multiple irregularities in the transaction histories of loans consolidated.  Navient has not responded on each occasion.

83.    For example, Plaintiff Sanghavi had a $5,000 loan for law school (Loan 1-02 Stafford – Unsubsidized) that was later consolidated.  The transaction history is erratic, shows phantom interest being capitalized, and higher total balances than the actual disbursement, yet no entries for fees or interest. The entire transaction history for that Loan 1-02, which was unsubsidized, i.e., interest accrued while in school, shows the following:

- On 9/02/2003, there is an initial Disbursement of $5,000.00 and Total Balance of  Unpaid Principal of $5,000
- On 01/06/2004, there is an entry for School Refund of -$5,000.00 and a Total Balance of Unpaid Principal of $0.00
- Again on 01/06/2004, there is an entry for Disbursement of $5,000.00 and a Total Balance of Unpaid Principal $5,000.00
- Approximately 18 months later, on 06/21/2005, there is an entry for Capitalized Interest of $251.66 and a Total Balance of Unpaid Principal of $5,251.66
- However, 34 months later, on 04/26/2007, there is an odd entry for Capitalized Interest of $0.00 and a Total Balance of Unpaid Principal $5,251.66
- And 6 days after this, on 05/02/2007 – presumably when the consolidation payoff occurred – there is a Payment to Principal of -$5,251.66, and an entry of Interest for $537.43, making the Payoff Amount Total of -$**5,789.09**.

84.    The first issue is that the Capitalized Interest entry for April 26, 2007 is zero, yet 6 days later, when the loan was paid off through a consolidation, there is an additional $537.43 in interest.  Even if the interest accounts for the time period between capitalization periods, the timing of the April 26, 2007 capitalization appears to be random, at 34 months, from the previous capitalization on June 21, 2005 – which was almost 18 months after the disbursement. Moreover, Plaintiff Sanghavi's Loan 1-06 Consolidation was the loan that consolidated Loan 1-02 (which had an ending balance of $5,789.09), yet the starting balance for Loan 1-06

Consolidation, was inexplicably inflated above the disbursement amount of $5,789.09 – without any entries for fees, interest or the like – to $5,843. The following shows the first transaction history entry from Navient's online portal for Loan 1-06 Consolidation:

- On 05/02/2007 (the same day of the payoff of Loan 1-02) there is an entry for Disbursement of **$5,789.09**, Principal of $0.00, Interest of $0.00, but a Total Balance of Unpaid Principal of **$5,843.00**

85.    Plaintiff Sanghavi requested additional information related to those consolidated loans from Defendants, to no avail.

86.    Plaintiff Robalino-Sanghavi has had similar issues with irregular interest capitalization on consolidated loans.

87.    For example, on Plaintiff Robalino-Sanghavi's Loan 1-07 Global Health Stafford loan consolidated January 4, 2011, transaction history entries show erratic capitalizations of interest:

- On 12/28/2006, there is an entry for a Disbursement of $5,000, yet the Total Balance of Unpaid Principal is $4,993.20 (oddly less than the disbursement)
- On 4/26/2007, there is an entry for a Disbursement of $5,000 and shows a Total Balance of Unpaid Principal of $9,993.20
- On 7/11/2008, there is an entry for Capitalized Interest of $0
- On 7/22/2009, there is an entry for a Payment of $0.97 to Interest and the same Total Balance of Unpaid Principal of $9,993.20
- On 2/27/2010, there is an entry for Capitalized Interest of $2,042.22 and a Total Balance of Unpaid Principal of $12,035.42
- On 4/1/2010, there is an entry for Capitalized Interest of -$73.98 and a lowered Total Balance of Unpaid Principal of $11,961.44
- A separate entry on 4/1/2010 adds Capitalized Interest of $73.98 back to the Total Balance of Unpaid Principal of $12,035.42
- On 4/7/2010, 6/30/2010, and again on 6/30/2010 there are Payment entries of $0
- Then, on 10/1/2010 there is an entry for Capitalized Interest of $484.26 and a Total Balance of Unpaid Principal of $12,519.68
- On 1/4/2011, the date of the consolidation, there is a Payment of $12,464.17 to Principal and $221.56 to Interest, leaving a Total Balance of Unpaid Principal of $55.51

- Finally, on 1/24/2011 there is a Payment of $55.51 to Principal and $.023 to Interest (Totaling $55.74) and a Total Unpaid Principal Balance of $0.00.

88.     Plaintiffs requested additional information related to those consolidated loans from Defendants, to no avail.

## IV.   Defendants Systematically Misapply Extra Loan Payments to Interest

89.     Plaintiffs have repeatedly tried to make extra payments toward principal for years, but have either been misdirected by Navient's representatives or Navient has misallocated payments even when Plaintiffs have followed instructions perfectly.

90.     Moreover, Navient has inconsistently applied extra payments that were made in a similar manner (e.g., online portal, paper check, electronic check) and identical dates, so as to continually move the target and change the rules so that Plaintiffs cannot make extra payments to principal in a predictable manner.

91.     Defendants systematically, intentionally, and maliciously misapply extra and early payments in order to prevent Plaintiffs from paying down principal – all to avoid potential losses in income for Defendants by penalizing Plaintiffs.

92.     For example, after repeated conversations with Navient representatives over the phone, several representatives explained that "timing" extra payments to "hit" the account the same day or just after the regularly scheduled payment is debited will allow the extra payment to go 100% to principal.  In other words, make two separate payments on the same day.

93.     On other occasions, Navient representatives have said to Plaintiffs that extra payments cannot go 100% to principal, but the effectiveness of extra payments can be greatly enhanced when sent on the same day as the automatically debited payment.

94.     On yet another occasion, Navient stated the following in response to the below:

19

**Plaintiff Sanghavi:** I made a $102 payment to principal only on the Smart Option and Private Consolidation loans on 6/6.  The payments were made to be deducted via Navient's website on the date of the auto-debit for the minimum payments in order to, as per your representatives, to go to 100% to principal.  NEITHER of these payments went to principal only.  Please provide a written explanation.  Misapplication of my payments has been an ongoing issue which neither your phone representatives nor online representatives - after exhausting conversations - have been able to answer truthfully or accurately.  Navient's practices are in bad faith.  Again, please provide a written explanation.  Your past, seemingly automated responses, have not been fully on topic or helpful.

**Navient:** Thank you for contacting us with your inquiry.
Please note that we **are unable to allocate payments exclusively to your principal balance.**
When a payment is posted to an account, it is first applied to outstanding late fees (if applicable), then to interest that has accrued on the account. The remainder of the payment is then applied to the principal balance.
Payments are posted effective the date they are received. Your student loan is a simple interest loan; therefore, interest accrues daily on the unpaid principal balance. The amount of interest billed is based on a daily interest accrual calculation.
The interest accrual calculation may vary based on the number of days in each month. Payment application may vary every month depending on whether fees were charged and the amount of interest that accrued. Please refer to your Promissory Note for more information.
Making accelerated payments may significantly reduce the amount of interest paid during your repayment period. When you make payments early (or for amounts larger than required), your final payment may be less than originally scheduled.
When payments are late, additional interest accrues on your account, and your principal balance will not decrease as originally scheduled. As a result, the final payment required to satisfy your loan may exceed the payment reflected on your original repayment schedule.
Thank you for the feedback. We strive to meet and exceed a high quality experience for our customers. Your comments have been forwarded to the appropriate department so we can identify ways to improve our service.

95.     Notwithstanding, Navient applied identical payments on the same days of the month inconsistently to 100% to principal and then, the following month, 100% to interest.

20

96.     For example, Plaintiff Sanghavi's loans are automatically debited on the sixth day of each month – approximately $350.00 for Loan 7483 and approximately $650.00 for Loan 5114.

97.     On May 6, 2017, for Loan 7483, Navient automatically debited $353.43, applying $216.51 to principal and $136.92 to interest.  Plaintiff Sanghavi submitted an extra payment to be debited on the same day through Navient's online portal.

98.     On May 6, 2017, for Loan 7483, Navient debited $51.00 and correctly applied it 100% to principal.

99.     On May 6, 2017, for Loan 5114, Navient automatically debited $657.53, applying $460.43 to principal and $197.10 to interest.  Plaintiff Sanghavi submitted an extra payment to be debited on the same day through Navient's online portal.

100.    On May 6, 2017, for Loan 5114, Navient debited $51.00 and correctly applied it 100% to principal.

101.    The following month, however, Plaintiff Sanghavi followed the same steps, but Navient did not apply the extra payment the same way.

102.    On June 6, 2017, for Loan 7483, Navient automatically debited $361.61, applying $226.03 to principal and $135.58 to interest.  Plaintiff Sanghavi submitted an extra payment to be debited on the same day through Navient's online portal.

103.    On June 6, 2017, for Loan 7483, Navient debited $51.00, this time incorrectly applying 100% to **interest**.

104.    On June 6, 2017, for Loan 5114, Navient automatically debited $657.53, applying $516.38 to principal and $141.15 to interest.  Plaintiff Sanghavi submitted an extra payment to be debited on the same day through Navient's online portal.

105.    On June 6, 2017, for Loan 5114, Navient debited $51.00, this time incorrectly applying 100% to **interest**.

106.    Once again, Plaintiff Sanghavi requested an explanation from Navient to no avail.

107.    Plaintiff Robalino-Sanghavi has, and continues to have, identical experiences on the issue of Defendants incorrectly applying payments.

108.    For example, Plaintiff Robalino-Sanghavi's loans are automatically debited on the fifth day of each month – approximately $160.00 for Loan 9668 (Tuition Answer) and approximately $130.00 for Loan 1312 (Signature Student).

109.    On any loan, the frequency of the payments and payments to principal greatly reduce the length of indebtedness and cost of a loan.  Making payments, for example, on a biweekly basis rather than only once a month can reduce the length of a loan by years.  Plaintiff Robalino-Sanghavi has attempted to make extra biweekly payments toward her higher interest loans, however, Navient has routinely thwarted the effectiveness of such payments.

110.    Debt experts advise that when paying off multiple debts, borrowers should focus on paying the minimum payment on all the loans, then make additional payments toward the higher interest loans.  This will result in less interest accrual and reduce the cost and life of the loans.

111.    Navient allocates payments contrary to this sentiment.

112.    For example, Plaintiff Robalino-Sanghavi's Tuition Answer loan (Loan 9668) is at an interest rate of 10.75%, while the Signature Student loan (Loan 1312) is at an interest rate of 7%.  Navient automatically splits any extra payment applying more of the payment towards the loan with a 7% interest rate rather than the loan with a 10.75% interest rate –thereby elongating the life of the higher interest loan.

113.    Moreover, Navient allocated identical extra payments differently on consecutive months.

114.    On May 5, 2015, for Loan 1312, Navient automatically debited $156.36, applying $95.26 to principal and $61.10 to interest.  Plaintiff Robalino-Sanghavi had also submitted an extra payment of $101.00 and Navient applied $101.00 to principal on May 5, 2015.

115.    On May 5, 2015, for Loan 9668, Navient automatically debited $159.52, applying $100.86 to principal and $58.66 to interest.  Navient did not apply any of Plaintiff Robalino-Sanghavi's extra payment to this loan.

116.    On June 5, 2015, for Loan 1312, Navient automatically debited $156.36, applying $93.20 to principal and $63.16 to interest.

117.    On June 5, 2015 for Loan 9668, Navient automatically debited $159.52, applying $100.86 to principal and $58.66 to interest.

118.    Also on June 5, 2015, Plaintiff Robalino-Sanghavi submitted an extra payment of $101.00, this time, however, Navient split the extra payment and applied $101.00 as follows: $64.28 to Loan 1312 and $36.72 to Loan 9668.  Notably, Loan 9668 (10.75%) has a significantly higher interest rate than Loan 1312 (7%) yet Navient applied less of the extra payment towards the higher interest rate loan.

119.    On June 9, 2017, Plaintiff Robalino-Sanghavi asked the following question through Navient's online portal and received Navient's stock response:

> **Plaintiff Robalino-Sanghavi:** Despite repeated attempts to pay extra towards principal - extra payments setup to be withdrawn through the Navient website on the same day as the auto-debit minimum payment - Navient keeps applying extra payments toward interest. Please tell me exactly how and when to make extra payments that will go 100% toward principal.

> **Navient**: Thank you for contacting us with your inquiry.

23

Payments are posted effective the date they are received. Your student loan is a simple interest loan; therefore, interest accrues daily on the unpaid principal balance. Most student loans require payments to be applied first to outstanding fees, then to outstanding interest and the remainder to principal. The amount of interest billed is based on a daily interest accrual calculation. The interest accrual calculation may vary based on the number of days in each month. Payment application may vary every month depending on whether fees were charged and the amount of interest that accrued. Please refer to your promissory note for more information. Making accelerated payments may significantly reduce the amount of interest paid during your repayment period. When you make payments early (or for amounts larger than required), your final payment may be less than originally scheduled. When payments are late, additional interest accrues on your account, and your principal balance will not decrease as originally scheduled. As a result, the final payment required to satisfy your loan may exceed the payment reflected on your original repayment schedule.

120.    Navient's answer was yet again non-responsive.

121.    Navient inconsistently applies payments and changes the minimum monthly amount due so that monthly payments become irregular and difficult for the borrower to predict –leading to less effective extra payments and, sometimes, late fees.

122.    Some of Plaintiff Robalino-Sanghavi's loans remained in deferment while she completed her medical residency, which ended in June 2014.  She nonetheless began making payments toward these loans before they came due in an effort to reduce the principal balance.

123.    Navient applied each payment to interest only on Loan 1312 yet applied a small portion to principal on Loan 9668. These extra payments were split most times between the loans, then, every so often, Navient applied a payment completely to just one of the loans.

124.    For example, on August 5, 2014 and on August 14, 2014, Plaintiff Robalino-Sanghavi submitted two separate payments of $101.00.  Navient split the payments as follows:

- August 5, 2014: Loan 9668 – Total $38.46 (with $38.46 to principal)
- August 5, 2014: Loan 1312 – Total $62.54 (with $62.54 to interest)
- August 14, 2014: Loan 9668 – Total $38.22 (with $9.21 to principal, $29.01 to interest)

24

- August 14, 2014: Loan 1312 – Total $62.78 (with $27.62 to principal, $35.16 to interest)

125.     However, on September 5, 2014 and on September 16, 2014, Plaintiff Robalino-Sanghavi made the <u>same</u> separate payments of $101.00.  Navient split the payments as follows:

- September 5, 2014: Loan 9668 – Total $101.00 to principal
- **September 5, 2014: Loan 1312 – $0 applied to the loan**
- September 16, 2014: Loan 9668 – Total $101.00 (with $66.15 to principal, $34.85 to interest)
- **September 16, 2014: Loan 1312 – $0 applied to the loan**

126.     Then, on October 5, 2014, October 7, 2014, and October 15, 2014, Plaintiff Robalino-Sanghavi made the following payments:

- October 5, 2014: Loan 9668 – Auto payment Total $159.52 (with $99.67 to principal, $59.85 to interest)
- October 5, 2014: Loan 1312 – Auto payment Total $175.42, (with $6.31 **to principal, $169.11 to interest)**

127.     Plaintiff Robalino-Sanghavi made the same separate payments of $101.00. Navient split the payments as follows:

- October 7, 2014: Loan 9668 – Total $37.78, (with $31.54 to principal, $6.24 to interest)
- October 7, 2014: Loan 1312 – Total $63.22, (with $56.72 to principal, $6.50 to interest)
- October 15, 2014: Loan 9668 – Total $37.54, (with $12.60 to principal, $24.94 to interest)
- October 15, 2014: Loan 1312 – Total $63.46, (with $37.52 to principal, $25.94 to interest)

128.     Despite numerous requests by Plaintiffs, Navient failed to provide an answer to help reconcile the misapplication of payments.

129.     Indeed, on May 2, 2017, Plaintiff Sanghavi called Navient's customer service hotline and spoke with three separate representatives, including a supervisor, for two hours, to no avail.

130.    During that call, Plaintiff Sanghavi first spoke with Rachel (Agent ID C48692) about why his loans from Seton Hall Law School were categorized as Columbia University graduate school loans (which were taken out five years after law school), Rachel could not answer this question and stated a letter would be sent to Plaintiff Sanghavi with an explanation, they also discussed why extra payments were not going all to principal, Rachel advised that payments should be sent so that they post the same day as the automatic payment to ensure the extra payment would go to principal. Plaintiff Sanghavi also asked for the loan disclosures that accompanied his 2008 consolidation loan, Rachel said she would send all of these questions to the "office processing team" and then offered to transfer Plaintiff Sanghavi to further discuss the allocation of payments.

131.    Shortly thereafter, Plaintiff Sanghavi was transferred to Janice (Agent ID C42667) who reviewed specific transactions and stated that extra payments can be set up through Navient's website to be deducted the same day as the automatic payment – but that he must do this every month since there is no way to automate extra payments.  Janice stated that if Plaintiff Sanghavi sets up extra payments that way, it would go to principal.  Janice then offered to transfer Plaintiff Sanghavi to a supervisor to discuss reallocating previous extra payments that posted incorrectly.

132.    Shortly thereafter, Plaintiff Sanghavi was transferred to a Navient Supervisor, John (Supervisor Agent ID C53039).   John reviewed specific transactions with Plaintiff Sanghavi.  John was defensive and dismissive and repeatedly stated Plaintiff Sanghavi "should refer to the promissory notes" and repeatedly offered "interest accrues on a daily basis" as his answers to Plaintiff Sanghavi's questions that had little, if anything, to do with interest accrual. This was a recurring theme.

133.    When Plaintiff Sanghavi asked for Navient to retroactively apply the payments misallocated to interest back to principal, at first John said it was not possible, and that such a reversal would be a one-time reversal because they could not "back date," but that it was not in Plaintiff Sanghavi's best interest to do so because the "interest would still accrue."  When asked to clarify what that meant, John said it would simply end up costing Plaintiff Sanghavi more if Navient changed the payments to reduce the principal.

134.    Plaintiff Sanghavi requested those calculations, namely, that reversing the misallocations would somehow cost him more, in writing.  Plaintiff Sanghavi then requested a full audit of his loans.

135.    Ultimately, John agreed he would (i) audit all fee adjustments; (ii) provide copies of the promissory notes and disclosures; and (iii) calculate the impact of reversing the interest allocations of dozens of extra payments that he said would not be in Plaintiff Sanghavi's best interest.

136.    As of this filing, Navient has yet to provide any of these documents from the May 2, 2017 call.

137.    This interaction is on par with the majority of interactions between Plaintiffs and Defendants.

138.    Plaintiffs are penalized by Defendants' actions and loan repayment system, as the misapplication of payments to both loan principal and interest inhibits the repayment of principal and enhances the accrual of interest on the student loans.

139.    Navient has applied phantom fees to Plaintiffs' accounts and failed to provide any explanations for those fees or answers when Plaintiffs requested clarification and reversal.

140.    For example, while still in deferment, on September 21, 2008, Navient charged a $9.09 late fee on Loan 9668 and on July 20, 2009, Navient charged an $8.75 late fee on Loan 9668.  Navient has not provided an answer despite repeated requests.

141.    On July 22, 2009, on Loan 1312, Navient recorded a payment for $1.07.  No such payment was made by Plaintiff Robalino-Sanghavi, and when asked to clarify, Navient has not offered any explanation.

142.    Navient's Account History is intentionally misleading and inaccurate.

143.    For instance, on Plaintiff Robalino-Sanghavi's Loan 1-11 DL, the Unpaid Principal balance column is static at $258,816.54 and there are no capitalized interest entries, yet Navient shows the total balance is $ $364,490.54, which is over $105,000 worth of interest more than the original balance disbursed 6 years ago on the monthly transaction statements.  In other words, interest has been accruing since the overall balance has increased, yet there is no way for the borrower to determine how much and how often interest accrues.

144.    Navient has added inexplicable disbursements days after the loan was disbursed.

145.    For example, on January 3, 2011, $258,722.00 was disbursed for Loan 1-11 DL. On January 21, 2011 (18 days later) a Disbursement of $94.54 was added to the principal balance.

146.    As another example, on Plaintiff Robalino-Sanghavi's Loan 1-10 DL, the Unpaid Principal balance column is static at $69,420.83 and there are no capitalized interest entries, yet Navient shows the total balance is $87,424.00 on this subsidized loan, which is almost $18,000 worth of interest more than the original balance disbursed 6 years ago on the monthly transaction statements.  Again, interest has been accruing since the overall balance has increased, yet there is no way for the borrower to determine how much and how often interest accrues.

28

147.    Navient has also added inexplicable disbursements days after the loan was disbursed.

148.    For example, on January 3, 2011, $68,986.53 was disbursed for Loan 1-10 DL. On January 21, 2011 (18 days later) a Disbursement of $63.22 was added to the principal, and, on May 16, 2011 a disbursement of $371.08 was added to the principal balance.

149.    Moreover, Navient has charged excess interest on Plaintiffs' loans.

150.    For example, Loan 1-10 DL is a Direct Subsidized loan at a fixed interest rate of 6.5%.  The loan is subsidized, meaning, interest does not accrue while the loan is in deferment. Navient's website states that "Interest on Direct Subsidized and FFELP Subsidized Loans begins to accrue after your six month grace period."  According to Navient's website, this Loan 1-10 DL entered repayment on November 28, 2014.

151.    Using the formula from Navient's website to calculate the interest that should have accrued if no payments were made through August 28, 2017 would be as follows:

> The amount of interest that accrues on your loan is determined by a simple daily interest calculation:
> Your current principal balance
> × The number of days since your last payment
> × Interest rate factor = interest rate ÷ 365.25 (number of days in a year)
> = Your daily interest rate.
>
> the amount of interest to accrue daily in **2014** (11/28/2014-12/31/2014) is:
>
> Principal on November 28, 2014: $69,420.83
> × days (33) (November 28, 2014 to December 31, 2014)
> × Interest rate factor (interest rate: .065 (6.5% fixed) ÷ 365.25
> = $12.35 per day
> $12.35/day X 33 days = $407.69 through December 31, 2014
>
> the amount of interest to accrue daily in **2015** is:
>
> Balance on January 1, 2015: $69,828.52
> × days (365)
> × Interest rate factor (interest rate: .065 (6.5% fixed) ÷ 365.25

= $12.43 per day
$12.43/day X 365 days = $4,535.75 through December 31, 2015

the amount of interest to accrue daily in **2016** is:

Balance on January 1, 2016: $74,364.27
× days (365)
× Interest rate factor (interest rate: .065 (6.5% fixed) ÷ 365.25
= $13.23 per day
$13.23 /day X 365 days = $4,830.37 through December 31, 2016

the amount of interest to accrue daily in **2017** is:

Balance on January 1, 2017: $79,194.64
× days (239) (January 1, 2017 to August 28, 2017)
× Interest rate factor (interest rate: .065 (6.5% fixed) ÷ 365.25
= $14.09 per day
$14.09 /day X 365 days = $3,368.35 through August 28, 2017

152.    Accordingly, if Plaintiff Robalino-Sanghavi made no payments on this loan through 2017, and interest accrued according to the fixed interest rate and formula provided by Navient, the total accrued interest should be at most $13,142.15.  This amount should actually be less, however, since Plaintiff Robalino-Sanghavi starting making monthly payments in 2014. Navient, however, shows an accrued interest balance of over $18,000 through August 28, 2017. Despite repeated requests to help reconcile these amounts, Navient has failed to respond.

153.    This is important for several reasons.  Plaintiff Robalino-Sanghavi finished her medical school residency in June 2014.  After the grace period, repayment formally began on November 28, 2014.  As such, interest should have only begun to accrue – since this was a subsidized loan – at the end of November 2014 and continue until paid off.  Importantly, Plaintiff Robalino-Sanghavi began making payments in November 2014, meaning the amount of interest that accrued should actually be less since payments started.

## V.   Defendants' Repayment System and Customer Service is Designed to Impede Early Repayment and Discovery of Errors

154.   Every aspect of Defendants' repayment system is structured to inhibit the payment of additional principal and to prolong the life of indebtedness.  And, when a student loan borrower requests that an extra loan payment be applied in accordance with that borrower's request, Defendants systematically dissuade borrowers from pursuing the issue further by providing misinformation, failing to respond, and/or by misleading the borrower about possible solutions.

155.   When Plaintiffs were able to reach a Navient customer representative to ask specific questions about incorrectly posted transactions (e.g., why was interest capitalized on this specific date?), the Navient representatives, seemingly by rote, instructed Plaintiffs to refer to their Promissory Note for answers.

156.   Notably, the loan applications and Promissory Notes are devoid of specifics, including actual interest rates and term duration.  Even if they contained this information, those documents would not shed any light on a specific posted transaction – a point most Navient customer representatives refused to acknowledge.   Also of import, Navient customer representatives "do not have access to the Promissory Notes in their system." And, as detailed below, have provided conflicting information about loan terms.

157.   Also set forth above, Plaintiff Sanghavi has two student loans with Defendants: Loan 7483 and Loan 5114.

158.   Plaintiff Sanghavi requested a copy of his Promissory Notes for all outstanding loans during at least three phone conversations with Navient representatives over a period of a several months.  On May, 3, 2017, Navient sent Plaintiff Sanghavi a copy of Promissory Notes for Loan 7483 and Loan 5114.

159.    As set forth above, Plaintiff Robalino-Sanghavi has four student loans with Defendants: Loan 1-10 DL, Loan 1-11 DL, Loan 1312, and Loan 9668.

160.    Plaintiff Robalino-Sanghavi has, over several months, repeatedly requested Promissory Notes for all outstanding loans: (1) Loan 1312, (2) Loan 9668, (3) Loan 1-10 DL, and (4) Loan 1-11 DL, but has not received all of them.  Indeed, despite repeated requests over the phone and through Navient's online portal, Navient has failed to provide the Promissory Notes for the two loans with the largest balances totaling $450,000 according to Navient, namely, Loans 1-10 DL and Loan 1-11 DL.

161.    Plaintiff Robalino-Sanghavi is a full-time practicing physician and a mother of toddler twins.  Multiple, hour-long conversations with Navient are challenging, especially when ultimately fruitless.  As a result, in 2016, Plaintiff Robalino-Sanghavi executed and submitted Navient's form Authorization to Release student loan information to her husband, Plaintiff Sanghavi, a practicing attorney, so that they could share the burden of dealing with Navient customer service.

162.    Notwithstanding, in early 2017, when Plaintiff Sanghavi called Navient to discuss issues about his wife's loans, Navient stated they had nothing on file authorizing release of information to Plaintiff Sanghavi and could not discuss his wife's loans with him until after another executed form was submitted by Plaintiff Robalino-Sanghavi.

163.    On May 25, 2017, Plaintiff Robalino-Sanghavi submitted another Authorization to Release form through Navient's online portal system.  This time, Plaintiff Robalino-Sanghavi took a screenshot of the confirmation (since no other confirmation, e.g., email, letter, etc. is provided by Navient).  Nonetheless, a few weeks later, when Plaintiff Sanghavi asked to discuss

his wife's loans, Navient claimed there was nothing on file authorizing release to discuss issues with Plaintiff Sanghavi.

164.    The misplacement of Plaintiffs' Authorization to Release form is just one example of Navient's labyrinth-like customer service system that is intentionally designed to dissuade borrowers from making inquiries about their accounts and to throttle borrowers determined enough to continue on.

165.    For example, Navient's online portal Help Center allows borrowers to submit inquiries through its Email Us section.   The convoluted format of Navient's responses to questions through its Email Us section – if there is a response at all – is designed to discourage users from using the system.   Borrowers' questions and Navient's responses follow disparate paths of emails, website pages, and documents which the user must navigate between.   All with different information and tracking numbers, and none that are easily reconcilable with the other.

166.    Navigating to the Email Us section is laborious and tedious and often leads to the website timing out and logging the user off – regardless of the user's Internet connection speed. In addition, once the user clicks on the Email Navient with Your Question link, the user must type her question in a box to submit to Navient.   Once submitted, Navient sends the user an email confirmation with a seven digit reference number, <u>however, there is no record of the actual question in this confirmation</u>.   To make matters worse, when Navient responds to a question, the seven digit reference number is not included in the body of the response and, the actual question is often not included in the response.   If Navient responded effectively, a user might be able to infer or recall the details of her question – based on information in the response – but this is most often not the case.   Navient's responses are perfunctory and non-specific, regardless of the specificity of the question.

167.    As a result of Navient's convoluted query system, Plaintiffs began taking screenshots of their questions submitted.

168.    The following is a typical example of the interaction with Navient's online help system.

> **Step 1:** The user logs in and navigates to Navient's **Help Center**.
>
> **Step 2:** The user navigates to the **Email Us** section located on the bottom of the **Help Topics** page.
>
> **Step 3:** The user chooses from several drop-down boxes then types in her question in the Messages box.
>
> **Step 4:** The user clicks Submit and submits her question.  There is no confirmation number on the website, only a new webpage that reads "Thank you for your email.  We'll email you an answer or post a personalized message to your inbox account."
>
> **Step 5:**  Navient sends out an automated confirmation email with a seven digit reference number.
>
> **Step 6:** Once Navient has prepared a response, the user receives another automated message that then directs the user to log in to her account in order to view the response.
>
> **Step 7:** Once the user logs in to Navient, she is taken to a separate site with a **Correspondence** section through the **Inbox/Upload** section. Notably, there is a prominent section on the Navient website for **Messages**, however, that is separate and distinct from the **Correspondence** section.   The Correspondence tabs lists all of the messages from the past 12 months, however, only by the seven digit reference number and general phrases like "Response to email" or "Statement."
>
> **Step 8:** Once the user clicks the link to the appropriate document, the actual response document is devoid of identifying information – it contains <u>no reference</u> to: (i) the seven digit reference number; (ii) date of response;  and, often, (iii) does not contain the actual question.

169.    If the user has a follow up question, there is no way to respond directly within the same query chain. Instead, the user <u>must create a new query altogether</u>. Not only is this wildly inefficient, it is intentionally inefficient as a dilatory tactic by Navient.

170.    On May 25, 2017, Plaintiff Robalino-Sanghavi requested a copy of her Promissory Notes through Navient's online portal:

> **Plaintiff Robalino-Sanghavi:** Please send a hard copy of the Promissory Notes for all loans. Thanks.
>
> **Navient:** Thank you for your inquiry. I have requested copies of your Promissory Note to be sent to you. For the protection of your account, we are not able to send these documents via email. We will be sending these documents via mail.

171.    On May 30, 2017, Navient sent copies of <u>some</u> Promissory Notes but **<u>only</u>** for Loan 1312 and Loan 9668. Promissory Notes for Loan 1-11 DL and Loan 1-10 DL were not provided.

172.    On July 20, 2017, Plaintiff Robalino-Sanghavi again requested copies of her Promissory Notes, but this time, only for Loan 1-11 DL and Loan 1-10 DL.

> **Plaintiff Robalino-Sanghavi:** Please send the Master Promissory Note and all related documents for: 1-10 DL Consolidated - Subsidized 1-11 DL Consolidated – Unsubsidized. Thanks.
>
> **Navient:** Thank you for your inquiry regarding the Promissory Note for your Federal Direct Consolidation Loan. We are here to help you in any way that we can, and we hope that you find the following information helpful.
> As you requested, we have submitted a request to have the Promissory Note for your Federal Direct Consolidation Loan (disbursed January 3, 2011) located and sent to you via U.S. Mail. You should receive that document within two to four weeks.

173.    Separately, on July 19, 2017, Plaintiff Sanghavi, on Plaintiff Robalino-Sanghavi's behalf, called Navient customer service and spoke with Tamika (Agent ID E76753). Tamika confirmed an Authorization for Release was in the database for Plaintiff Robalino-Sanghavi's

file.  Plaintiff Sanghavi asked several specific questions surrounding capitalization of interest, incorrect balances, and repayment terms on all of Plaintiff Robalino-Sanghavi's loans.  Tamika advised she would request the Promissory Notes for Loan 1-10 DL and Loan 1-11 DL which would be sent out through Navient's processing team as well as a letter explaining why certain charges were incurred and details concerning the repayment terms, initial balances, and repayment start dates.  Tamika stated that this would be initiated within 7-10 days.

174.   Presumably, in response to the conversation on July 19, Navient sent a letter dated July 27, 2017 to Plaintiff Robalino-Sanghavi via regular mail.

175.   This letter, however, did not include (i) a copy of the Promissory Notes for Loan 1-10 DL and 1-11 DL, nor (ii) an explanation of the questionable charges, nor (iii) any other issues discussed with Tamika.  In fact the only information provided was information on the remaining terms of only the private loans (Signature Student 1312 and Tuition Answer 9668) as detailed from the July 27 letter sent via regular mail below:

> **Navient:** Thank you for your inquiry and your business with Navient.  In response to your recent request, we have researched your concerns regarding your student loan account.   Specifically, you requested repayment terms.  According to our records, loan ending 1312 has been in repayment for 37 terms.  The dates for repayment are June 1, 2008 to June 30, 2008 and July 10, 2014 to July 10, 2017.  This loan has used 20 terms of In-School Deferment from July 1, 2008 to February 26, 2010.   47 Terms have been used for an Internship Deferment from July 6, 2010 to June 10, 2014.  Four months of Forbearance time has been used from April 1, 2010 to July 1, 2010.  This loan has 143 terms remaining.  Loan ending in 9668 has been in repayment for 88 terms from June 1, 2008 to August 5, 2008, June 23, 2009 to August 5, 2009, April 1, 2010 to April 11, 2010, and June 6, 2010 to July 10, 2017.  In-School Deferment for 16 terms from August 6, 2008 to June 22, 2009 and August 6, 2009 to February 26, 2010, and two months Forbearance time used from April 12, 2010 to June 5, 2010.  This loan has 32 terms remaining.

Notably, the terms provided in the letter are incorrect.

36

176.    In sum, on at least 6 separate occasions in writing or on the phone, Plaintiff Robalino-Sanghavi has requested a copy of her Promissory Notes and applications specifically for Loan 1-11 DL and Loan 1-10 DL (totaling, according to Navient, approximately $450,000), including a request directly to Navient's Office of the Customer Advocate (explained further below).

177.    Navient still has yet to provide Plaintiff Robalino-Sanghavi a copy of the Promissory Notes and applications for Loan 1-11 DL and Loan 1-10 DL.

178.    Plaintiff Robalino-Sanghavi does not have a copy of either of the Promissory Notes for Loan 1-11 DL or Loan 1-10 DL, and it appears Navient does not have them either. Without original terms outlined for the debt, including duration, proof of original principal amount, and interest rate at inception, Plaintiff Robalino-Sanghavi is at Navient's mercy on what Navient asserts to be nearly half-a-million dollars in debt owed on Promissory Notes it refuses to produce.

179.    This opacity allows Defendants to dictate and change the terms of any loan at will, with little-to-no visibility for Plaintiffs.   And, Defendants have used this lack of transparency as a means to dramatically increase costs to Plaintiffs by increasing duration, misallocating payments to interest, and capitalizing interest incorrectly.

## VI.    **Navient Hides the Ball**

180.    Navient deliberately fails to provide borrowers with critical information pertaining to their loans.

181.    For instance, every loan, whether it is for a mortgage, car, credit card, or student loan, share three key components.  The amount of principal, the interest rate, and the duration.

37

182.    In all instances, the total cost of the loan and the monthly payments of principal and interest can be shown using an amortization schedule.  An amortization schedule is a table of the periodic loan payments, displaying the amount of principal and interest that comprise each payment until that loan is paid in full at the end of the term.  If the interest rate is fixed, the amortization schedule gives a clear picture of the costs of the loan for the full duration.  If, however, the interest rate is variable, the initial amortization schedule gives the borrower a clear picture of the costs of the loan based on the initial interest rate, but could become stale once the interest rate changes.  In either scenario, an amortization schedule is crucial at the outset for both borrower and lender to agree on what the payments and cost of a loan will be.

183.    Navient does not provide amortization schedules to borrowers regardless of whether the loans have a fixed or variable interest rate.  The promissory notes are silent on the actual duration of the loan and instead offer maximum periods, e.g., "up to 300 months" or "the maximum Repayment Period is 30 years."

184.    In other words, the student loan borrower is at the mercy of Navient when it comes to determining the minimum monthly payments and projecting the total cost of the loan if the borrower were to make extra payments.

185.    Navient has refused to provide amortization schedules to Plaintiffs despite their repeated requests.  Moreover, Navient has repeatedly provided inaccurate terms on Plaintiffs' loans.

186.    For instance, on July 7, 2017, after failing to provide an answer over repeated phone conversations, Plaintiff Robalino-Sanghavi requested the terms of each loan through Navient's online portal and received <u>different</u> loan terms <u>on the same loans</u> from Navient:

> **Plaintiff Robalino-Sanghavi:** Please provide the initial Term and the remaining term on each outstanding loan.

> **Navient:** Thank you for your inquiry. We are here to help navigate you on your path of finical [sic] success.
> The initial repayment period of your Department of Education Loan was 177 months. You have 145 months remaining in the repayment term.
> Your Tuition Answer Loan [9668] had 197 month repayment term and has 32 months remaining in the repayment term.
> Your **Signature Student Loan** [1312] had a 180 original payment term and has **140 months remaining** in the repayment term.

187.   Just twelve days later, on July 19, 2017, after reviewing the terms based on repayment start dates, Plaintiff Sanghavi requested clarification on all terms over the phone with Navient representative, Tamika (Agent ID E76753).   As set forth above, Navient sent the following response dated July 27, 2017 via regular mail:

> **Navient:** Thank you for your inquiry and your business with Navient.  In response to your recent request, we have researched your concerns regarding your student loan account.   Specifically, you requested repayment terms.  According to our records, **loan ending 1312** has been in repayment for 37 terms.  The dates for repayment are June 1, 2008 to June 30, 2008 and July 10, 2014 to July 10, 2017.  This loan has used 20 terms of In-School Deferment from July 1, 2008 to February 26, 2010.   47 Terms have been used for an Internship Deferment from July 6, 2010 to June 10, 2014.  Four months of Forbearance time has been used from April 1, 2010 to July 1, 2010.  **This loan has 143 terms remaining.**  Loan ending 9668 has been in repayment for 88 terms from June 1, 2008 to August 5, 2008, June 23, 2009 to August 5, 2009, April 1, 2010 to April 11, 2010, and June 6, 2010 to July 10, 2017.  In-School Deferment for 16 terms from August 6, 2008 to June 22, 2009 and August 6, 2009 to February 26, 2010, and two months Forbearance time used from April 12, 2010 to June 5, 2010.  This loan has 32 terms remaining.

188.   Loan ending in 1312 is the Signature Student loan.   Navient's response was seventeen days after the initial response, <u>yet added three months</u> to the terms remaining – no payments were made by Plaintiffs in between responses that would have offset this calculation. Moreover, Navient made no mention of Plaintiff Robalino-Sanghavi's Department of Education loans – which she requested and which carry the bulk of the balances at approximately $450,000 according to Navient.

189.   Plaintiff Sanghavi has, and continues to have, identical experiences with Defendants on the issue of responses to requests about the terms of his loans.

190.   For instance, on July 7, 2017, after failing to provide an answer over repeated phone conversations, Plaintiff Sanghavi requested the terms of each loan through Navient's online portal and received <u>different</u> loan terms <u>on the same loans</u> from Navient:

> **Plaintiff Sanghavi**: Please provide the initial Term and the remaining term on each outstanding loan.

> **Navient**: Thank you for contacting us with your inquiry. Your loan ending in 7483 had an initial term of 360 months and you currently have **267 months remaining** of repayment remaining. Your **loan ending in 5114** had an initial term of 180 months and you currently have **132 remaining months of repayment** remaining.

191.   After reviewing the terms and comparing the repayment start dates, Plaintiff Sanghavi requested further clarification on July 11, 2017 through Navient's online portal:

> **Plaintiff Sanghavi**: On 7/10/2017, Jordan advised that the terms for my outstanding loans are: 5114 Smart Option - initial 180 months, remaining 132 months; and 7483 Private Consol. initial 360 months, remaining 267 months. The repayment period for the 5114 Smart Option loan started 7/13/2011 - which should make the number of payments months 72 - through today 7/11/2017 - with a remainder of 108 months (not 132) and the repayment period for the 7483 Private Consol. started 4/28/2008 - which should make the number of payment months 110 - through today 7/11/2017 - with a remainder of 250 months (not 267). Please explain why this is not the case. Thanks.

> **Navient**: Thank you for contacting us with your inquiry. **Your Loan - 5114** was disbursed with 180 terms of repayment. It has used 50 terms of repayment, and entered repayment on November 12, 2012. Therefore, it has **130 months remaining**, with an estimated payoff date of May 6, 2028.
> **Your Loan -7483** was disbursed with 360 terms of repayment. It has used 96 terms of repayment, and entered repayment on April 27, 2008. Therefore, it has **264 months remaining**, with an estimated payoff date of September 6, 2039.

192.    Navient provided conflicting remaining terms for each loan; the discrepancy for Loan 7483 was off by three months, and the discrepancy for Loan 5114 was off by two months. Navient sent its responses within ten days of each other – no payments were made by Plaintiffs in between responses that would have offset this calculation.

193.    Navient's refusal to provide accurate and consistent loan information on its loans is intentional and demonstrates clearly its attempts to keep its borrowers in the dark on critical aspects of the debts.

194.    More to this point, Navient manipulates loan transaction history without notice and without explanation.

195.    For example, Plaintiff Robalino-Sanghavi accessed her Transaction History on Navient's website on three separate dates in 2017 and printed the history provided on those days. The Tuition Answer Loan 9668 shows three separate ending balances for the transaction history on the same day: April 1, 2010.  In other words, accessed on June 22, 2017 the balance shown for April 1, 2010 was $20,841.63, accessed on July 7, 2017 the ending balance shown for April 1, 2010 was $18,362.61, and accessed on August 25, 2017 the ending balance shown for April 1, 2010 was $19,431.36.  The balance on a transaction dated seven years ago should not fluctuate, yet Navient has provided no answers even attempting to explain this issue.

## VII.   Navient's Monthly Statements are Deceptive and Misleading

196.    Navient deliberately withholds the breakdown of payment allocations toward principal and interest on its monthly statements in order to conceal or, at least, delay discovery of any errors or misapplication of payments by borrowers.

197.    For example, on a typical mortgage statement, information provided includes date and application of the last payment, the amount of that payment that was applied toward principal and interest, and allocation of any extra payment (towards principal and/or interest).

198.    Navient, provides no such information on its monthly statements.

199.    For example, in two consecutive monthly statements from Navient showing Plaintiff Sanghavi's extra payment of $51, both display the extra payment identically as "PAYMENT," however, Navient applied the extra payment of $51 <u>correctly</u> towards <u>principal</u> on one, but applied the extra payment of $51 <u>incorrectly</u> towards <u>interest</u> on the following.

200.    In fact, viewing the monthly statement, Navient makes it impossible to discern (much less correct) any misallocation of extra payments.

201.    As such, Plaintiff Sanghavi has no way of knowing from Navient's monthly statement that the same $51 payment that went only to principal in May, now went only to interest in June.

202.    The Account History section on Navient's website is the only way for a borrower to determine how payments have been allocated by Navient.  This involves navigating through a multi-step process on Navient's website and is only discovered after a series of selections through clicks and drop-down boxes.

203.    Notably, the borrower cannot discern the principal, interest or fees breakdown from Navient's monthly statement, nor through the By Transaction screen on Navient's Account History website page.  In fact, the <u>only</u> way to determine the payment breakdown for principal, interest or fees is to log in to Navient, go to the Account History Section, select the By Loan dropdown, then select the specific loan.

204.    Moreover, on its monthly statements, Navient puts the Unpaid Interest and Unpaid Fees in the same category column in order to conceal or at least delay discovery of any fees charged.

205.    For instance, if a borrower had $22 in accrued interest for the month, but also had $30 in late fees, the column would simply read: Unpaid Interest and Unpaid Fees $52 – making it impossible to know from the monthly statement that a late fee had been charged.  This is especially true since the interest amount so frequently fluctuates from month to month on Defendants' issued loans.  Similar to the allocation issue, borrowers can only discover if fees were charged through Navient's convoluted website.

206.    Navient also fails to provide accurate information on loan changes.  For example, any notices about changes to a loan from Navient appears on the second page of a monthly statement, and simply lists a litany of <u>possible</u> reasons for the impending change, but no clear explanation of which one applies to the borrower:

> Your repayment terms have changed due to **<u>one or more</u>** of the following reasons:
> 1. The grace, separation, deferment, or forbearance period has expired. Interest may be capitalized (added to the loan principal), depending on your loan program.
> 2. The borrower's enrollment status has changed.
> 3. The payment due date has changed.
> 4. The interest rate has changed.
> 5. The payment amount has changed, as requested.
> 6. The repayment terms has been extended, as requested.
> 7. The Graduate Repayment Period has ended.
> 8. The modified repayment plan, which required interest only payments on this loan for a specified period of time has ended. (Emphasis added.)

207.    Navient provides instructions to submit extra payments, but then fails to honor them despite the borrower's diligent adherence to those instructions.  For example, on its monthly statements, Navient states:

**How can I be sure my payments are allocated correctly and on a timely basis?**
To ensure accurate and timely processing of your payment, you can send your payment with the included remittance slip, pay by Auto Pay, or pay online at Navient.com.  <u>You can instruct us to allocate payments differently</u>.  Clearly write your instructions on **a separate piece of paper** included with your check.  <u>We cannot process instructions written on the check </u>or remittance slip. (Bold in original, underline added for emphasis.)

208.   On July 25, 2017 Plaintiff Robalino-Sanghavi sent, via regular mail, the following extra payments and instructions with relevant account numbers to Navient:

To Whom It May Concern:

Enclosed you will find two separate checks to be used ONLY TO REDUCE PRINCIPAL on the accounts referenced above and outlined below:

**Signature Student Loan Group No.: -1312 – Check No. 380 in the amount of $11.00.**
**Tuition Answer Loan Group No.: -9668 – Check No. 381 in the amount of $11.00.**

While I have Auto Pay set up for the monthly payments for each account, I wish to further reduce the principal balance with the extra payments provided.  Thanks.

209.   On July 25, 2017 Plaintiff Sanghavi sent, via regular mail, the following extra payments and instructions with relevant account numbers to Navient:

To Whom It May Concern:

Enclosed you will find two separate checks to be used ONLY TO REDUCE PRINCIPAL on the accounts referenced above and outlined below:

**Private Consolidation Loan Group No.: -7483 – Check No. 383 in the amount of $11.00.**
**Smart Option Loan Group No.: -5114 – Check No. 382 in the amount of $11.00.**

While I have Auto Pay set up for the monthly payments for each account, I wish to further reduce the principal balance with the extra payments provided.  Thanks.

44

210.    Notwithstanding Plaintiffs' specific instructions that correctly followed Navient's directions, Navient applied <u>all four</u> of the extra payments to <u>interest only</u>.

211.    Notably, while Navient states that it "cannot process instructions written on the check" – therefore requiring a separate letter for instructions – it nonetheless instructs borrowers to "**be sure to include your 16-digit Loan Group Number on your check** or money order and <u>make it payable to Navient</u>."

212.    The monthly statements from Navient for the federal loans (Loan 1-11 DL and Loan 1-10 DL) for Plaintiff Robalino-Sanghavi are different in presentation and information provided – compared with the private loan monthly statements.  These monthly statements are combined into one statement for both loans, but since Navient is also the loan servicer for these loans, they are equally deceptive.

213.    For example, the front page does not contain accurate interest and loan details, they are instead located on the second page in <u>very small font</u>.  The first page shows just the unpaid principal balance as $328,237.37.  The <u>actual</u> total balance according to Navient, however, is $449,187.30, again this is only located on the second page in laughably tiny font.

214.    On October 10, 2017 Plaintiff Robalino-Sanghavi sent, via regular mail, the following extra payments and instructions with relevant account numbers to Navient:

> To Whom It May Concern:
>
> Enclosed you will find two separate checks to be used ONLY TO REDUCE PRINCIPAL on the accounts referenced above and outlined below:
>
> **Loan ID No.: 1-10DL – Check No. 390 in the amount of $21.00.**
> **Loan ID No.: 1-11DL – Check No. 390 in the amount of $30.00.**

> While I have Auto Pay set up for the monthly payments for each account, I wish to further reduce the principal balance with the extra payments provided.  Thanks.

215.    Notwithstanding Plaintiffs' specific instructions that correctly followed Navient's directions, Navient applied <u>both</u> of the extra payments to <u>interest only</u>.

216.    Navient also incorrectly capitalized interest on Plaintiffs' loans.

217.    For example, Plaintiff Sanghavi's Loan 7483 entered full repayment in 2008, for which Navient inconsistently applied automatically-debited monthly payments amongst principal and interest.

218.    Indeed, Navient applied payments toward principal erratically – at times increasing the principal amount from automatic payments, other times decreasing them which, in turn, unpredictably changes the amount of outstanding principal.

219.    On May 18, 2013, Defendants unilaterally changed the posting of payments from the 28th of each month to the 6th of each month starting in June 2013.  No payment, however, was debited in May 2013, and the principal allocation for June 2013 was significantly lower – though the monthly debited amount was <u>identical</u> to previous months.

220.    This seemingly minor change pushed the monthly payment back by 9 days, and Defendants <u>decreased</u> the allocation toward principal and <u>increased</u> the amount toward interest by $50 on the same automatically debited monthly payment.  And, this move deprived Plaintiff Sanghavi of <u>any payment</u> to principal in May.  Given the lack of transparency and allocation breakdowns in the monthly statements, most borrowers would see the same monthly debit amount and think nothing of it.

221.    Plaintiff Sanghavi has requested an explanation from Navient on this issue, to no avail.

222.     Moreover, Defendants' application of payments have been inconsistent even with its own language in its promissory notes.  For example, Defendants' Payments or Application of Payments sections contain "pay in advance" or "pay ahead" language in promissory notes for Plaintiffs' Signature Student, Tuition Answer, Smart Option, and  Private Consolidation Loans in following provisions:

**Signature Student Loan 1312** – 2008 Promissory Note: Payments – Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued interest, and the remainder to principal.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.  (For example, if my payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

**Tuition Answer Loan 9668** – 2007 Promissory Note: Application of Payments – Payments will be applied first to applicable fees, charges, and costs then to accrued interest; and the remainder to principal (including Capitalized Interest) as permitted by applicable law.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.  (For example, if my monthly payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

**Smart Option Loan 5114** – 2011 Promissory Note: Payments will be applied first to applicable fees, charges, and costs; then to interest; and the remainder to principal, as permitted by applicable law.  Additionally, payments in excess of the amount due will be credited against the payment(s) that would otherwise be required in the next billing cycle(s) unless the excess payment is made during the first billing cycle prior to any payment being due, in which case it will be applied to principal and not credited against the next payment(s).

**Private Consolidation Loan 7483** – 2008 Promissory Note:  Payments – Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued interest, and the remainder to principal.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.  (For example, if my payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

223.    Defendants' application of payments, however, do not adhere to the promissory notes Payments or Application of Payments sections.  Extra payments made by Plaintiffs in between automatic monthly debits – that were applied by Navient towards principal <u>and</u> interest, and were <u>in excess</u> of the upcoming automatic monthly debit amounts – had little or no impact on reducing the amount of interest paid the next month or even the following monthly amount due.

224.    Indeed, Plaintiffs made interim extra payments that did not consistently reduce interest, even though a portion – and sometimes full amount – of the interest was paid in between automatic monthly payments.

225.    Navient deliberately changed the allocation of payments to neutralize Plaintiffs' attempts to reduce principal and increase Defendants' revenue – even in contravention to its own promissory notes – and have deliberately failed to provide Plaintiffs with any meaningful explanation or insight into the method of application of their payments.

## VIII.  <u>Navient Promotes the Use of Cosigners, But Hinders Their Release as Promised</u>

226.    In 2016, 2015, and 2014, 64% of Navient's Private Education Loans had cosigners.

227.    In numerous filed Form 10-K Reports, Defendants tout their use of cosigners as a way to mitigate adverse impacts to its bottom line.  Defendants are, therefore, strongly incentivized to not release cosigners.

228.    Defendants promote the use of cosigners to students through promotional materials, websites, and through coaxing by representatives when a student is applying for a loan, and lead students and cosigners to believe that a cosigner can be easily released once the

student begins making timely payments over 12 months and meets Defendants' credit requirements.

229.    Defendants offer borrowers benefits for signing up a cosigner like lower interest rates and lower costs if they obtain a cosigner, and offered access to "free quarterly FICO score benefit to students and cosigners with a Smart Option Loan."

230.    Plaintiff Sanghavi's Smart Option Student Loan was disbursed in 2011.  On April 24, 2012, he received the first and only FICO Score benefit notice he would receive from Defendants.  Plaintiff Sanghavi's cosigner never received this benefit.

231.    Navient states a student debtor can apply for cosigner release after 12 consecutive on-time payments and meeting its "credit underwriting criteria."

232.    Plaintiff Sanghavi's father is a cosigner on Plaintiff Sanghavi's loans held by Navient.  Plaintiff Sanghavi has made over ten years of consecutive payments on Loan 7483 and five years of consecutive payments on Loan 5114.

233.    Plaintiff Sanghavi has consistently been rated with an "excellent" or "exceptional" FICO score credit rating.

234.    On September 16, 2016 Plaintiff Sanghavi filed an application via regular mail to release his 70 year-old, retired father as cosigner from his loans.

235.    On September 22, 2016, Plaintiff Sanghavi sent a request through Navient's online portal to confirm receipt of the cosigner application.

236.    On September 23, 2016, less than one week after the application was mailed, Navient denied Plaintiff Sanghavi's request with the following correspondence sent through the Navient online portal:

> We received your request to release your cosigner(s) from your private student loan(s). Unfortunately, we're unable to grant your request because

you fail to meet the eligibility criteria for a cosigner release due to the following reason(s):

proportion of loan balances to loan amounts too high // amount owed on accounts is too high // insufficient income
Our credit decision **was based in whole or in part on information obtained in a report** from the consumer reporting agency indicated below.

237.   The reasons for denial offered by Navient are broad and vague in scope, and designed so that borrowers like Plaintiff Sanghavi could not cure the purported defects and reapply for release.

238.   For example, if Navient provided a debt-to-income ratio standard to meet – rather than "amount owed on accounts is too high" as part of its determination letter, borrowers could figure out whether they were in the ballpark and could make adjustments and reapply, or determine they were so far off that reapplication would be fruitless.  Navient's vague reasoning is intended, by design, to deprive Plaintiffs and borrowers alike of this opportunity.

239.   Moreover, in a separate follow up correspondence from Navient sent through the Navient online portal on September 22, 2016 to Plaintiff Sanghavi, Navient wrote:

Thank you for your inquiry and for your business with Navient. Your cosigner release application was denied and a notice of determination was sent to your email on file September 22, 2016. Please be sure to check your junk/spam folders. If you need this notice to be resent, please let us know. We cannot discuss your credit denial with you. **You are welcome to pull your own credit report and see what information was used by us to make the determination.**

240.   Navient's September 23, 2016 letter to Plaintiff Sanghavi stated that the denial decision was based "in whole or in part" on the credit report.

241.   Alternatively, Navient's September 22, 2016 letter states that Navient cannot discuss the denial with Plaintiff Sanghavi and that Plaintiff Sanghavi is "welcome to pull" his own credit report to "see what information was used by us to make the determination."

242.    These two responses are deliberately inconsistent, which leave Plaintiff Sanghavi in a position bereft of answers.

243.    In fact, during a phone conversation, Navient's representatives told Plaintiff Sanghavi that they cannot discuss the decision with him, but that the debt-to-income ratio may have been an issue.  Navient would not disclose, or did not have access to, the actual debt-to-income ratio needed for cosigner release.

244.    On July 25, 2017, via confirmed fax, Plaintiff Sanghavi reapplied to release his father as cosigner.

245.    Navient did not respond.

246.    On August 14, 2017, Plaintiff Sanghavi, through Navient's online portal, simply requested confirmation of receipt of the cosigner application and a status update.

247.    Navient did not respond.

248.    On August 16, 2017, Plaintiff Sanghavi called the general customer service number for Navient at 888-252-5543, and when prompted, entered his account identifying number, and was automatically rerouted to the Office of the Customer Advocate (further detailed below) and spoke with Amy (Agent ID E41429).

249.    Amy stated that Navient had not received a cosigner release application from Plaintiff Sanghavi and asked that he upload the application using Navient's website or fax it to 888-248-1949.  When Plaintiff Sanghavi stated he had a confirmation from the fax number provided on Navient's cosigner release application, 800-443-9723, Amy stated she was not sure where that number came from but to resend the application either online or at the fax number she provided.

250.   On August 16, 2017, Plaintiff Sanghavi uploaded the same cosigner release application (along with previous fax confirmation) from July 25, 2017 using Navient's website. Navient did not provide any confirmation (e.g., email, correspondence or message notice) of the upload other than a generic submission results screen.

251.   On August 18, 2017, just two days later, Navient sent two identical messages (one for Loan 5114 and one for Loan 7483) through its online portal denying Plaintiff Sanghavi's request with the following reasoning similar to the previous vague reasoning in 2016:

> We received your request to release your cosigner(s) from your private student loan(s). Unfortunately, we're unable to grant your request because you fail to meet the eligibility criteria for a cosigner release due to the following reason(s):
>
> insufficient income // proportion of loan balances to loan amounts too high // amount owed on accounts is too high
>
> Our credit decision **was based in whole or in part on information obtained in a report** from the consumer reporting agency indicated below.

252.   Incidentally, Plaintiff Sanghavi has made years of consecutive payments and had an "exceptional" FICO score of 807 at the time of his 2017 application to release his father.

253.   Notably, both letters while addressed to Plaintiff Sanghavi and his father, were only delivered to Plaintiff Sanghavi's Navient message box online.  In other words, no notice was sent to the cosigner.

254.   On August 16, 2017, Plaintiff Robalino-Sanghavi filed an application to release her 93 year-old retired grandmother as cosigner from her loans taken out in 2007.  Based on Plaintiff Sanghavi's experience, she submitted the application both via confirmed fax and via Navient's website.

255.    In a letter to Plaintiff Robalino-Sanghavi dated August 18, 2017, Navient released her cosigner and sent a similar letter to Plaintiff Robalino-Sanghavi's grandmother.

256.    Defendants systematically, intentionally, and maliciously obstruct Plaintiffs' ability to release cosigners by failing to provide Plaintiffs with actionable reasons for denying release, even when warranted by any measure.

## IX.    Navient's Office of the Customer Advocate is Merely an Imitation of its Customer Service

257.    In several of its filed Form 10-K Reports, including 2016, Navient touts its responsiveness to its student loan borrowers, which Navient claims is bolstered by its creation of an Office of the Customer Advocate.

258.    Navient's purported responsiveness is anything but that.

259.    After repeated attempts to get answers from Navient's regular customer service representatives online and over the phone, on June 7, 2017, Plaintiff Sanghavi attempted to obtain contact information for the Customer Advocate by typing in "customer advocate" in the search box on Navient's online Help Center, only several completely unrelated hits came up.

260.    As such, Plaintiff Sanghavi requested to speak with the Office of the Customer Advocate on June 7, 2017 via Navient's online help portal:

> **Plaintiff Sanghavi:** I'd like to speak with your Customer Advocate as soon as possible. Please provide a contact and their contact information. Thanks.
>
> **Navient:** Thank you for reaching out to us regarding your educational loans. Please know you are welcome to contact us with the details of your concerns via email and we will gladly assist you with your concerns. If you wish to speak to a representative, please call our Customer Service Department at the number provided below. Our Interactive Voice Response system is designed to respond to spoken words and allow you to obtain account information quickly and easily without waiting for a representative. After calling us, you will first be asked the reason for your call or why you are calling Navient. Please provide this information first

as it is crucial to ensure you receive the best possible service by directing your call to the appropriate area.

261.    On June 7, 2017, Plaintiff Robalino-Sanghavi requested to speak with Navient's Office of the Customer Advocate:

> **Plaintiff Robalino-Sanghavi:** I'd like to speak with your Customer Advocate as soon as possible. Please provide a contact and their contact information. Thanks.

> **Navient:** We are excited that you are ready to repay your student loans. We are here to help navigate you on your path of finical [sic] success. If you wish to speak to a representative, please call 800-722-1300.
> Our Interactive Voice Response system is designed to respond to spoken words and allow you to obtain account information quickly and easily without waiting for a representative. After calling us, you will first be asked the reason for your call or why you are calling Navient. Please provide this information first as it is crucial to ensure you receive the best possible service by directing your call to the appropriate area.

262.    On July 19, 2017, Plaintiff Sanghavi tried again to speak with the Office of Customer Advocate:

> **Plaintiff Sanghavi:** I have tried repeatedly to get answers to simple questions about my outstanding loans, but have either received no response or inaccurate answers -and no response to my requests for clarification. I would like to speak directly with someone from the Office of the Customer Advocate. Thanks.

> **Navient:** Thank you for contacting us with your request to speak with the Office of the Customer Advocate. I apologize that the previous response to your email did not adequately address your inquiry. Our goal is to provide quality customer service and ensure that the customer's concerns are addressed the first time. After reviewing your account again, (insert result of research here) [sic]. A representative will call you as soon as possible.

263.    Finally, on July 24, 2017, a Navient representative called Plaintiff Sanghavi.  The representative, Allen (Agent ID 75036), however, was <u>not</u> from Navient's Office of the Customer Advocate, but instead, was another customer service representative.  Plaintiff Sanghavi stated he would like to discuss his and his wife's loans with the Customer Advocate.  Allen first

asked to hear what the issues were and advised that he could not discuss Plaintiff Robalino-Sanghavi's loans because no Authorization to Release form was on file.  Plaintiff Sanghavi explained that the Authorization to Release form was submitted on May 25, and in fact, Plaintiff Sanghavi had just discussed Plaintiff Robalino-Sanghavi's loans with another representative, Tamika, without issue just five days earlier on July 19.  Allen stated he could do nothing about the fact that there was no Authorization to Release form in the Navient database and asked Plaintiff Sanghavi to discuss the issues with his loans instead.

264.    Like many other Navient representatives, Allen was defensive and dismissive at times.  Over the next thirty minutes or so, Plaintiff Sanghavi laid out the laundry-list of issues that Plaintiffs had been having with Navient's transactions; Allen decided that Plaintiff Sanghavi's issues warranted escalation to a Customer Advocate and stated a Customer Advocate should call him within 24-48 hours.  Notably, Allen advised that someone from the Office of the Customer Advocate would call Plaintiff Sanghavi, but that if Plaintiff Sanghavi failed to answer or call back quickly, Navient would close the issue.

265.    Plaintiff Robalino-Sanghavi has still not received a meaningful response to her request to speak with a Customer Advocate on June 7, 2017.

266.    On July 26, 2017, Plaintiff Sanghavi received a voice message from Nina (Agent ID E69597) from the Office of the Customer Advocate and stated she was calling to discuss his recent inquiry and left a number to return her call (888) 545-4199.

267.    Navient attempted to obstruct even Plaintiff Sanghavi's return call to the Customer Advocate.  Plaintiff Sanghavi returned Nina's call within the hour but could not reach her directly.  Instead, Plaintiff Sanghavi spoke with a woman named Laura in the Office of the Customer Advocate.  Laura asked to place Plaintiff Sanghavi on hold while she spoke with Nina

who, Laura said, was on another phone call.  When Laura returned to the line, she explained that Nina said she had everything she needed and did not need to speak with Plaintiff Sanghavi, and that, instead, she would do some research and would call Plaintiff Sanghavi once she had more information for him.  Plaintiff Sanghavi asked, nonetheless, to speak with Nina to make sure she had a full picture of the issues.  After a short hold, Nina came on the phone.

268.    Plaintiff Sanghavi first raised the issue of the missing Authorization to Release form and told Nina he had a screenshot of the confirmation from May 25.  Nina asked Plaintiff Sanghavi to email it to her while they were on the phone and provided her direct email address. Once she received it a few minutes later, Nina confirmed the Authorization to Release form should have been in Navient's database but could not explain why it was missing.  Nonetheless, Nina agreed that for the sake of efficiency, any issues relating to Plaintiff Robalino-Sanghavi's loans could be addressed through Nina, rather than assigning a separate Customer Advocate.

269.    Plaintiff Sanghavi and Nina spoke for approximately forty minutes.  Plaintiff Sanghavi raised several specific questions about various transaction postings and issues surrounding sending extra payments based on the advice of various Navient customer service representatives (e.g., sending payments on the same day as the automatic payment, sending payments through the website instead of by check, etc.)

270.    Notably, Nina advised that Plaintiff Sanghavi could set up an extra amount to be automatically withdrawn with the automatic monthly payments, but only through her – in order to get as much of the extra payment to be allocated to principal.  Plaintiff Sanghavi noted this option was never offered to him before by any other Navient representative over the past several years.

271.    Plaintiff Sanghavi also noted that the transaction <u>history</u> on some of the loans changed and stated he had a screen shot from June 22, 2017 and from July 7, 2017 of the transaction history for Loan 9668 showing different ending balance numbers for April 1, 2010. Nina initially stated that it could be the "transaction codes" not posting, however, once Nina received the screenshots via email while still on the phone, she acknowledged this was strange.

272.    In fact, Nina acknowledged that several issues were strange, including the categorization of all loans as under Columbia University, the random capitalizing of interest on each loan – she noted that a document provided to Navient in 2009 from Harvard University – where Plaintiff Robalino-Sanghavi attended in <u>2001</u> – may have somehow caused errant capitalization of interest in one case on her unrelated 2008 loans for medical school, and several others.   Nina and Plaintiff Sanghavi discussed several issues, and Nina could not provide answers to the odd transactions.

273.    In the end, Plaintiff Sanghavi offered to list out several of the issues and types of issues Plaintiffs had been experiencing.   Nina stated she could receive the list through email, but that any response from her would have to be drafted and sent as a hard copy letter after being reviewed by their "quality control" department.

274.    On July 28, 2017, Plaintiff Sanghavi sent the following email directly to the Customer Advocate, Nina:

> Hi Nina,
>
> Below is a list of general and specific questions/issues relating to our student loans. I mentioned some of these over the phone with you on Wednesday (7/26), but wanted you to have a more comprehensive – though not exhaustive – list.  I apologize in advance for the long list, but these questions have been posed to Navient Customer Service in one form or another (either via emails through the Navient website or over the phone) over the past several years and, more frequently, over the past few months.   Some have been answered with perfunctory, non-helpful

responses or sometimes, not responded to at all.  I can provide you with
these questions and responses if you need.  Thanks.

**Specific Questions/Issues with Loans**

    **Maulik Sanghavi Loans**

        **(1)  7483 Private Consolidation; and**
        **(2)  5114 Sallie Mae Smart Option.**

- After reviewing the transaction histories, I've noticed inexplicable
  capitalizations of interest, adjustments, fees, uneven application of extra
  payments to interest and not principal, and the like.  I have requested
  previously and am requesting from the Office of the Customer Advocate
  the following:

  o   a full audit of disbursements, payments, allocation of payments
  amongst loans, periods of forbearance and/or deferments, postponement
  programs, etc.

  o   all documents provided at the closing of each loan (including
  Repayment Schedules, disclosures, etc.)

  o   an explanation of Loan terms including both the initial terms and
  interest rates and the remaining terms and repayment start date

  o   an explanation for any late fees

  o   an explanation for each adjustment

  o   an explanation for each application of capitalized interest and formula
  for capitalized interest (including interest rate used at that time)

  o   an explanation for each application of extra payment, including
  formula or rationale for allocations between loans

  o   an explanation of why some extra payments went more towards lower
  interest rate loans even when the balances were similar

  o   an explanation of why the Loan Details for both of my loans
  incorrectly show Columbia University as the institution for both loans –
  the Private Consolidation Loan in 2008 was for loans incurred at Seton
  Hall University Law School – started 9/2003 - graduated 5/2007; the
  Smart Option Loan was for Columbia University - started 5/2011 -
  graduated 5/2012

  o   an explanation of why interest was capitalized on the Private
  Consolidation while I was making monthly payments while attending
  Columbia in 2011-2012

  o   an explanation of why the cosigner release request was rejected in
  2016.  Please provide a debt to income ratio requirement

    o   an explanation of why some extra payments went all to principal and some went all to interest on the same day of consecutive months (see for example, 5/6/2017 and 6/6/2017)

    o   an explanation of why Customer Service provided different answers about remaining terms on outstanding loans within two weeks of each other:

- 7/10/2017 answer to question posed via Navient website on 7/7:
  - "Your loan ending in 7483 had an initial term of 360 months and you currently have **267** months remaining of repayment remaining."
  - "Your loan ending in 5114 had an initial term of 180 months and you currently have **132** remaining months of repayment remaining."
- 7/20/2017 answer to question (referencing 7/7 question and 7/10 answer) posed via Navient website on 7/11:
  - "Your Loan -5114 was disbursed with 180 terms of repayment. It has used 50 terms of repayment, and entered repayment on November 12, 2012. Therefore, it has **130** months remaining, with an estimated payoff date of May 6, 2028."
  - "Your Loan -7483 was disbursed with 360 terms of repayment. It has used 96 terms of repayment, and entered repayment on April 27, 2008. Therefore, it has **264** months remaining, with an estimated payoff date of September 6, 2039."

    o   an explanation for the following questions relating to the Smart Option:

- Why capitalized interest was charged in 3/2013 after repayment began in 2012
- Why there are deferral payments fees if they were made by credit card
- What are the periodic $50 adjustments for
- What are the .24 and .02 adjustments and other random adjustments under $1 for?

- Please note that while all of the examples above illustrate the issues, they do not include all of the discrepancies, and I am requesting a full explanation for all transactions for each loan.
- Please provide all correspondence between Navient/Sallie Mae and Maulik including emails (including any questions posed by Maulik/Michelle), disclosures accompanying closing documents, mailings, notices, etc. for the life of each loan outstanding.

**Michelle Robalino Loans**

    **(1)  1312 Signature Student;**
    **(2)  9668 Tuition Answer;**
    **(3)  1-10 DL Consolidated – Subsidized; and**
    **(4)  1-11 DL Consolidated – Unsubsidized.**


- After reviewing the transaction histories, I've noticed inexplicable capitalizations of interest, adjustments, fees, uneven application of extra payments to interest and not principal, and the like. I have requested previously and am requesting from the Office of the Customer Advocate the following:

o  a full audit of disbursements, payments, allocation of payments amongst loans, periods of forbearance and/or deferments, postponement programs, etc.

o  all documents provided at the closing of each loan (including Repayment Schedules, disclosures, etc.)

o  an explanation of Loan terms including both the initial terms and interest rates and the remaining terms and repayment start date

o  an explanation for any late fees

o  an explanation for each adjustment

o  an explanation for each capitalized interest and formula for capitalized interest (including interest rate used at that time)

o  an explanation for each application of extra payment, including formula or rationale for allocations between loans

o  an explanation of why some extra payments went more towards lower interest rate loans even when the balances were similar

o  an explanation of the lack of capitalized interest entries on the transaction history for the 1-11 DL and 1-10 DL loans.  The unpaid balance clearly has an interest component since the unpaid principal columns on the transaction history are lower than the outstanding balance

- Tuition Answer and Signature Student
  o  Why are capitalized interest entries in principal then backed out?
  o  What is the $1.07 charge on 7/22/2009
  o  Why is there capitalized interest after repayment started in 2008?
  o  Why are payments entered then backed out? See 6/30/2010
  o  How often was interest capitalized?  Why are there entries 1 month apart?
  o  How did the balance go from $12,171 to $14,903 on the same day 7/11/2008?

60

- Please note that while all of the examples above illustrate the issues, they do not include all of the discrepancies, and I am requesting a full explanation for all transactions for each loan.
- Please provide all correspondence between Navient/Sallie Mae and Michelle including emails (including any questions posed by Maulik/Michelle), disclosures accompanying closing documents, mailings, notices, etc. for the life of each loan outstanding.

## General Issues with Navient Customer Service Responsiveness

- Conflicting information given on similar and identical questions, especially in response to how to apply extra payments to principal. Answers range from "you can make extra payments to 100% principal on the same day as auto debit" to "you cannot make any extra payments to principal."
- Never told can make extra payments added to auto pay.
- The website does not allow adding an extra amount to auto pay online.
- The user cannot see the question they write for an inquiry once submitted online or proof within the email confirmation. Also, sometimes the answer includes the question posed on the bottom of the answer, and sometimes it is blank.
- There is no time/date stamp on responses of the actual answer/letter .
- The user cannot directly respond to the answer in order to pose a related follow up question.
- Most responses to questions are canned, perfunctory answers that do not attempt to answer the specific question posed.
- Requests to speak with the customer advocate were either ignored or I was told to call customer service and given the wrong number. (The number provided was for people calling from abroad.)
- The Correspondence section is a separate website – which frequently causes inadvertent log outs from the system.
- We often received different answers to identical questions.
- Customer Service representatives often replied that "interest accrues daily" or "please refer to your master promissory note" regardless of the specific question on the phone. Customer service does not have access to the actual promissory note so they can't answer any specific questions.
- There is no payment breakdown on monthly statements (e.g., principal and interest).
- Payments to higher balance but not higher rate even – but not all the time, sometimes higher payment to wrong one.

- In an answer to my request for an amortization schedule, Customer Service advised they cannot provide an amortization schedule on any loans. In a separate response, Customer Service recommended we look at the "repayment schedule" at the beginning of the loan to determine term duration. I referenced that response and requested a "repayment schedule" and received a canned answer stating Navient does not offer amortization schedules.
- I have requested all correspondence between Navient/Sallie Mae and Maulik and Michelle including emails (including any questions posed by Maulik/Michelle), disclosures accompanying closing documents, mailings, notices, etc. for the life of each loan outstanding. Repeated requests in writing to no avail.
- We completed and submitted a Release Authorization on Michelle's loans allowing me to discuss her loans on 5/25/2017. When speaking with a Customer Service representative a few weeks after, they said the Release was not in the system.

Again, I know it's a lot, but this should give you a good sense of what we have been dealing with. Thanks for looking into this and I look forward to your letter response.

275.  On July 31, 2017, Plaintiff Sanghavi sent a follow up email with additional information:

Hi Nina,

Two quick follow up points:
(1) we have repeatedly requested a copy of the Master Promissory Notes for Michelle's 1-10 DL and 1-11 DL but have not received them. The last request was made on 7/19/2017. Please provide; and
(2) When a consumer calls the Navient customer service lines, they are taken through a series of automated prompts for several minutes. Sometimes the system hangs up -on its own and for no reason, sometimes the system will not respond to a request to speak with a "representative" and just hangs up. Sometimes, the system offers to call the user back and hangs up once it confirms the call back number. I have only once actually received a call back using this option - over several attempts. All in all, if the consumer is able to get a person on the phone, it takes on average 8-12 minutes.

Also, could you please confirm you've received this email? Thanks.

276.    On July 31, 2017, in a separate email, unconnected to the email chain sent by Plaintiff Sanghavi, Nina responded with the following:

> M. [sic] Maulik Sanghavi:
>
> We have received your correspondence regarding your student loan account.  We are working to get answers but need time to research your account.  We will contact you with a response as soon as we can.  We appreciate your patience.
>
> Please call us at 888-545-4199 if you have any questions.

277.    On July 31, 2017, Plaintiff Sanghavi sent an additional follow up email with additional information:

> Hi Nina,
>
> One more to the list. On July 25, I sent paper check payments to Navient with a letter stating payment should go to principal only for our Signature Student, Tuition Answer, Private Consolidation, and Smart Option loans. Each check was in the amount of $11. I have scanned copies of these instructions.
>
> On July 27, all payments posted 100% to interest. Please advise. Thanks.

278.    On August 3, 2017, Plaintiff Sanghavi added:

> Hi Nina,
>
> We would also like to know what the outstanding balance on the 1-10 DL and 1-11 DL loans will be at the end of the 25 years under the IBR program - based on the monthly payment amounts over this past year. Also, is the forgiven amount taxable as income when forgiven?  Thanks.

279.    On August 4, 2017, in a separate email, Nina responded:

> Mr. Sanghavi :

We are working to get answers but need time to research your account. We will contact you with a response as soon as we can. We appreciate your patience.

Please call us at 888-545-4199 if you have any questions.

280. On August 10, 2017, Plaintiff Sanghavi

Hi Nina,

The questions we submitted are on all loans, but I just wanted to confirm that there are similar issues on the loans that were consolidated, e.g., unexplained fees, random capitalized interest, etc. Just want to make sure those loans are included in your review (even though they were consolidated and have zero balances now).

Please also let me know when you think you'll be able to provide a response. Thanks.

281. On August 10, 2017, in a separate email, Nina responded:

We are working to get you the answers you need and are working diligently to respond as soon as possible. We appreciate your patience as we work through your request.

282. Separate from the interactions with the Customer Advocate, on August 11, 2017, Plaintiff Sanghavi received an automated email from Navient advising "An important tax return document is available online."

283. Plaintiff Sanghavi logged in to his Navient account, navigated to the Correspondence section, then clicked on the PDF document labeled "IMPORTANT TAX DOCUMENT."

284. The document Navient sent to Plaintiff Sanghavi on August 11, 2017 was a 1098-E Eligibility Certification Form dated April 30, 2008 from Sallie Mae.  In it, Sallie Mae requested Plaintiff Sanghavi sign the certification form and return it to them.

285. Navient provided no other explanation or background.

286.    Justifiably confused as to why Navient was sending a certification form dated from 9 years ago, Plaintiff Sanghavi reached out to the Customer Advocate by email:

> Hi Nina,
>
> Today, I received the below email from Navient.  The document provided online is a 1098 certification dated 4/30/2008 from when I consolidated my Seton Hall Law School loans. Do you know what this is about? Thanks.

287.    On August 12, 2017, in a separate email, Nina responded:

> Mr. Sanghavi:
>
> We have received your correspondence regarding your student loan account.  We are working to get answers but need time to research your account.  We will contact you with a response as soon as we can.  We appreciate your patience.
>
>  Please call us at 888-545-4199 if you have any questions.

288.    Navient's Customer Advocate's answer was non-responsive.

289.    Navient even controls the wait times of callers to its customer service phone system, and  has the ability to speed up wait times and, presumably, to also throttle and increase wait times through its automated system.

290.    When a borrower calls the general customer service number 888-272-5543, the caller is routed through a long, automated system often littered with advertisements, stock notices, and automatic hang-ups.  Indeed, if the caller asks to speak with a "representative" or "operator" the automated system asks the caller to provide a reason the caller would like to speak to a representative and says "if you're unable to provide one, I'll have to end the call," if the caller says "representative" again the system abruptly hangs up.

291.    On August 11, 2017, Plaintiff Sanghavi called Navient for the first time since his interaction with the Customer Advocate on July 26, as Plaintiff Sanghavi had a question about his transaction history and a previous loan payoff amount.

292.    Plaintiff Sanghavi called the general customer service number for Navient at 888-252-5543 as he always had. When prompted, he entered his account number, and was automatically rerouted to the Office of the Customer Advocate to Amelia (Agent ID E71000). When Plaintiff Sanghavi asked how he was routed straight to the Office of the Customer Advocate, Amelia simply asked how she could help.

293.    On August 16, 2017, Plaintiff Sanghavi was automatically rerouted again to the Office of the Customer Advocate, this time to representative Amy (Agent ID E41429).  When Plaintiff Sanghavi asked how he was routed directly to the Customer Advocate, Amy stated she "was not sure."  She asked which number he called and confirmed that Plaintiff Sanghavi had called the general number and not the phone number for the Customer Advocate.  Amy did not state that once a Customer Advocate inquiry is started, that calls go directly to them, in fact, she sounded just as surprised as Plaintiff Sanghavi.

294.    In fact, any time Plaintiff Sanghavi calls the general customer service number now, he is routed directly to the Office of the Customer Advocate once he inputs his account number.

295.    In total, this direct rerouting has occurred August 11, 16, 22, and 23, 2017.

296.    The Office of Customer Advocate closes at 5 p.m. EST, but Navient's general customer service is open until 9 p.m. EST.

297.    Ironically, now when Plaintiff Sanghavi calls the general customer service line after 5 p.m., he can <u>no longer reach anyone</u> since Navient routes the calls only to the Office of the Customer Advocate, which closes at 5 p.m. EST.

298.    On August 23, 2017, Plaintiff Sanghavi discovered yet another issue with Navient's transaction history relating to Navient's changing of the date the automatic payments are debited for Loan 7483 and Navient's failure to debit in May 2013.

299.    Plaintiff Sanghavi first called Navient's customer service number 888-272-5543 and was, once again, automatically routed to the Office of the Customer Advocate.

300.    Plaintiff Sanghavi spoke with Samantha (Agent ID E75357), who explained that she did not see any errors on her end with the transaction history and offered to send Plaintiff Sanghavi a copy, and stated the transaction codes could be causing an error.  When Plaintiff Sanghavi asked whether she saw a payment debit for the missing month (May 2013), Samantha again stated she did not see any errors, and then quickly transferred the call to Nina, the Customer Advocate assigned to Plaintiffs' inquiries.  The call went straight to Nina's voicemail and Plaintiff Sanghavi left a message asking for a return call and explaining he would send a follow up email.

301.    On August 23, 2017, Plaintiff Sanghavi sent a follow up email:

> Hi Nina,
>
> Just checking in. Also, I noticed that automatic payments on my Loan ending 7483 switched from being posted on the 28th of each month to the 6th - starting in June 2013 - and that there was no debit for May 2013 (and the allocation to principal was a lot lower in June). I spoke with Samantha in your office. She said the transactions looked ok on her end and that it may just be the transaction codes that are causing a glitch on the transaction history - but then transferred me to your voicemail. Just wanted to figure out why that was and whether it was something on my end or Navient's. Thanks.

302.    On August, 23, 2017, in a separate email, Nina responded a few minutes later:

> We have received your correspondence regarding your student loan account.  We are working to get answers but need time to research your account.  Your questions and request are very specific and we are working to get you all the answers you are requesting. We will contact you with a response as soon as we can.  We appreciate your patience.

> Please call us at 888-545-4199 if you have any questions.

303.    On August 29, 2017, over one month from the initial review by the Customer Advocate, Plaintiff Sanghavi received the following stock email update:

> We are still working to get answers but need more time to research your account.  We will contact you with a response shortly.  We appreciate your continued patience.

> Please call us at 888-545-4199 if you have any questions.

304.    On September 12, 2017, Nina, the Customer Advocate sent 15 emails containing attachments of hundreds of documents relating to Plaintiff Sanghavi's loans.  The initial email contained the following:

> Thank you for your inquiry and for your business with Navient.
> Please understand that 14 other email will be sent to send you all the documentation you requested.
> You are welcome to call me directly and toll free at (888) 545-4199, x411972, with any questions you may have concerning this issue.

305.    The documents Navient sent, however, were simply photocopies of past monthly statements, tax forms and certifications, and loan applications.  Navient did not provide – either through the 15 emails or via hard copy – a letter answering questions about specific transactions or any other details in response to the numerous bulleted questions sent and discussed by Plaintiff Sanghavi with the Customer Advocate.

306.     Plaintiff Sanghavi posed specific questions to the Customer Advocate on July 26, 2017.  Navient's emails with attached documents in response was sent on September 12, 2017. It took Navient 48 calendar days to send photocopies of monthly billing statements and the like. In essence, Navient's answer was non-responsive.

307.     Similar to Navient's general customer service responses – which are typically, and by design, perfunctory and non-responsive – the Customer Advocate's responses have been stock and non-specific.

308.     Moreover, <u>none</u> of the documents sent on September 12 related to Plaintiff Robalino-Sanghavi's loans.  To this, Navient responded:

> Your concerns regarding your spouses [sic] loans will be addressed
> separately and is still being worked. [sic]

309.     As of the filing of this Complaint, Navient's Customer Advocate has not responded to <u>any issues</u> surrounding Plaintiff Robalino-Sanghavi's loans.

## <u>COUNT I</u>
## COMMON LAW FRAUD

310.     Plaintiffs incorporate Paragraphs 1–309 as if fully set forth herein.

311.     Defendants made, authorized or caused representations to be made to Plaintiffs, which are set forth above.

312.     The material misrepresentations set forth above were fraudulent, and Defendants' representations fraudulently omitted material facts.

313.     Defendants knew that their representations and omissions were false and/or misleading at the time they were made.

314.     Defendants made the misrepresentations with the intent to deceive Plaintiffs.

315.     Plaintiffs justifiably relied upon Defendants' misrepresentations and omissions.

69

316.     As a result of their reliance upon Defendants' misrepresentations and omissions, Plaintiffs have been damaged.

## COUNT II
## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

317.     Plaintiffs incorporate Paragraphs 1–309 as if fully set forth herein.

318.     Pursuant to the New Jersey Consumer Fraud Act, "merchandise" includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. § 56:8-1(c).

319.     Defendants' services are "merchandise" as defined by N.J.S.A. § 56:8-1(c).

320.     Pursuant to N.J.S.A. § 56:8-2:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

321.     Defendants engaged in numerous unfair acts and practices in the servicing of Plaintiffs' loans, including:

    a.  Applying payments that should be applied to principal only to both principal and interest or interest only;

    b.  Applying deliberate, partial pre-payments against future interest payments and purported fees, rather than the reduction of a loan's outstanding principal balance;

    c.  Applying deliberate, partial pre-payments incorrectly, so that Plaintiffs are prevented from paying down their principal balance early and saving money, and ensuring that Defendants collect as much interest as possible;

    d.  Reducing the monthly payment amount due if Plaintiffs pay additional principal over what is the minimum amount due for their loan. As a result, when Plaintiffs' principal amount due is lessened, Defendants reduce the minimum monthly payment due, causing the  pay off date to remain the same, rather than decrease;

    e.   Applying payments that should be applied to principal only to both principal and interest, even when Plaintiffs specifically direct the payment to principal only;

    f.   Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

    g.   Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

    h.   Employing an antiquated, confusing, and misleading online payment system to provide information to Plaintiffs in order to prevent Plaintiffs from being able to understand their loan payments and applications;

    i.   Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

    j.   Refusing to apply payments only as directed by Plaintiffs in a clear manner in their online system;

    k.   Refusing to apply payments only as directed by Plaintiffs in a clear manner through their mail system;

    l.   Refusing to apply payments only in the manner set forth and/or directed by Plaintiffs;

    m.   Refusing to release cosigners even when release-eligibility criteria should have been met;

    n.   Refusing to provide accurate cosigner release criteria;

    o.   Refusing to provide accurate historical transactional information on student loans to Plaintiffs; and

    p.   Failing to provide Plaintiffs with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans.

322.    Defendants' practices, as set forth above, were unfair because:

    a.   The practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiffs with no meaningful choice, imposed an unreasonable burden on Plaintiffs and were so oppressive as to leave Plaintiffs with little alternative but to submit to the practices. Plaintiffs had no control over Defendants' acts, and Plaintiffs' attempts to ensure that loan payments were applied correctly, were futile, and

    b.   Plaintiffs cannot reasonably avoid the injury caused by Defendants, since Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiffs' instructions.

323.    Defendants' unfair practices and conduct were directed toward Plaintiffs.

324. Defendants intended for Plaintiffs to rely on their acts and practices in applying student loan payments correctly, including to the correct account, and, when applicable, correctly to interest and principal, or principal only, and correcting misapplied student loan payments.

325. Defendants also intended for Plaintiffs to rely on their loan billing statements, emails, website, and other correspondence as correct, even though the billing statements contained inflated and misleading principal balances, after Defendants impermissibly capitalized loan interest to loan principal, and emails, website, and other correspondence all contained inconsistent and inaccurate loan information.

326. Defendants' unfair and deceptive practices occurred during the course of conduct involving trade or commerce, specifically the collection of student loan debts.

327. Plaintiffs incurred damages due to student loan payments being applied in contradiction to their instructions, Defendants incorrectly applying payments that should have paid only to principal to both future interest and principal, and Defendants incorrectly capitalizing interest and shifting non-interest accruing loan interest back to interest-accruing loan principal.

328. Plaintiffs' damages were directly and proximately caused by Defendants' unfair acts and practices.

329. Defendants' conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

    a. Defendants' acts and practices in collecting student loans, misapplying loan payments, and impermissibly shifting interest to principal were directed to all individuals whose loans were serviced by Defendants; and

    b. Defendants' acts and practices otherwise implicate consumer protection concerns including, but not limited to, promoting fair and upright business practices.

330.     New Jersey Plaintiffs are authorized to bring a private action under the New Jersey Consumer Fraud Act pursuant to N.J.S.A. § 56:8-19.

331.     Defendants' conduct was willful and intentional and done with evil motive or reckless indifference to the rights of others.  Punitive damages are thus warranted.

332.     Reasonable attorneys' fees and costs should be awarded pursuant to N.J.S.A. § 56:8-19.

<u>COUNT III</u>
**BREACH OF CONTRACT – WRONGFUL PAYMENT APPLICATION**

333.     Plaintiffs set forth Paragraphs 1–309 as if fully set forth herein.

334.     Plaintiffs each entered into contracts with Defendants, including Master Promissory Notes.

335.     Plaintiffs' Master Promissory Notes contain provisions governing the application of payments.

336.     Plaintiffs' Master Promissory Notes contain sections captioned "RIGHT TO REPAY," which provides "I have the right to prepay all or any part of my loan at any time without penalty."

337.     Further, the Master Promissory Notes provide that: "Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued interest, and the remainder to principal.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds." Or "Payments will be applied first to applicable fees, charges, and costs; then to interest; and the remainder to principal, as permitted by applicable law.  Additionally, payments in excess of the amount due will be credited against the payment(s) that would otherwise be required in the next billing cycle(s) unless the excess payment is made during the first billing cycle prior to any payment

73

being due, in which case it will be applied to principal and not credited against the next payment(s)."

338.    Plaintiffs, however, were not permitted to prepay any or all of the debt owing.  As such, extra payments should have been applied to only outstanding principal – since that is the only way any of the debt is actually prepaid.

339.    Defendants repeatedly breached their contractual obligations with respect to the proper application of student loan payments made by Plaintiffs.

340.    Defendants repeatedly attempted to, and did, apply student loan payment money that should have immediately reduced loan principal to future interest, impermissible fees, and principal.

341.    Defendants' motivation arises from the daily accrual of loan interest as a function of the principal loan balance.

342.    By applying current payment amounts incorrectly, Defendants were able to allow more interest to accrue, and, therefore, prolong indebtedness and make more money in accrued interest from the student loans that they serviced.

343.    Defendants also breached contracts by impermissibly splitting singular loan payments across multiple lower interest student loans, such that payments would be applied unnecessarily to interest and thus reduce the amount of principal a given payment would reduce.

344.    Plaintiffs were damaged by Defendants' repeated breaches.

345.    Damages suffered include, but are not limited to: 1) student loan balances not decreasing properly due to misapplication of student loan payments; 2) paying interest that would not have accrued if Defendants had not breached their contracts and applied loan

payments correctly; and 3) time spent ensuring the correct payment application, after Defendants' misapplication of loan payments, generally in excess of six hours per month.

346. Defendants' repeated breaches of their contracts were willful, intentional, and made in bad faith. Therefore, punitive and/or exemplary damages are warranted.

<u>COUNT IV</u>
**BREACH OF CONTRACT – WRONGFUL INTEREST CAPITALIZATION**

347. Plaintiffs set forth Paragraphs 1–309 as if fully set forth herein.

348. Plaintiffs entered into the Master Promissory Notes with Defendants.

349. These contracts contain provisions governing principal, interest, and capitalization.

350. Capitalization occurs when loan interest is converted into loan principal.

351. Defendants repeatedly incorrectly capitalized interest and then inflated loan principal on Plaintiffs' loans. This wrongful capitalization constitutes a breach of contract.

352. Plaintiffs were damaged by Defendants' repeated breaches.

353. Damages suffered include, but are not limited to: 1) paying interest that would not have accrued if Defendants had not breached their contracts and had correctly applied student loan payments such that loan interest was not added to loan principal; and 2) time spent ensuring the correct payment application, after Defendants' misapplication of loan payments, generally in excess of six hours per month.

354. Defendants' repeated breaches of their contracts were willful, intentional, and taken in bad faith. Therefore, punitive and/or exemplary damages are warranted.

<u>COUNT V</u>
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

355. Plaintiffs set forth Paragraphs 1–309 as if fully set forth herein.

356.    Every contract contains an implied covenant that the parties will not engage in conduct that has the effect of depriving the other of the fruits of the contract.

357.    Through the afore-described conduct, Defendants have breached – willfully and deliberately – the implied covenant of good faith and fair dealing contained in the Master Promissory Notes.

358.    As a direct and proximate result of such breach, Plaintiffs suffered and are continuing to suffer damages.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendants:

a.    awarding compensatory damages;

b.    awarding treble damages, pursuant to § N.J.S.A. § 56:8-19;

c.    awarding attorneys' fees, filing fees, and costs of suit, pursuant to N.J.S.A. § 56:8-19;

d.    awarding exemplary and punitive damages;

e.    awarding such other and further relief as the Court may deem just and proper either in law or in equity.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on all issues so triable.

Respectfully submitted,

Plaintiffs Maulik Sanghavi and Michelle
Robalino-Sanghavi

By: <u>s/ Maulik M. Sanghavi</u>
      Maulik M. Sanghavi
      Federal Bar No. 020492007
      15 Roosevelt Avenue
      Cranford, NJ 07016
      Ph: (917) 582-5724
      Email: mauliksanghavi@gmail.com

## CERTIFICATION PURSUANT LOCAL CIVIL RULE 11.1

I hereby certify that to the best of my knowledge, information and belief that the matter in controversy is otherwise not the subject of any other action pending in any Court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.   I further certify that I am not aware of any other parties who should be joined in this action at this time.

<u>s/ Maulik M. Sanghavi</u>
Maulik Sanghavi

Dated: January 8, 2018